

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-11-2008

# USA v. Grape

Precedential or Non-Precedential: Precedential

Docket No. 07-3682

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Grape" (2008). *2008 Decisions.* Paper 11.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/11

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 07-3682

———

UNITED STATES OF AMERICA

v.

JOHN DOUGLAS GRAPE,

Appellant

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 05-cr-00033E)
District Judge:  Honorable Maurice B. Cohill, Jr.

———

Argued September 29, 2008
Before:  FISHER, CHAGARES and HARDIMAN, *Circuit
Judges*.

(Filed:  December 11, 2008)

Thomas W. Patton (Argued)
Office of Federal Public Defender
1001 State Street
1111 Renaissance Centre
Erie, PA 16501
     *Attorney for Appellant*

Robert L. Eberhardt
Rebecca R. Haywood (Argued)
Office of United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
     *Attorneys for Appellee*

---

OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

John Douglas Grape suffers from a long history of serious mental illness and is currently incarcerated pending trial on two charges involving the receipt and possession of child pornography. The District Court initially found Grape incompetent to stand trial on these charges, and the Government correspondingly wished to medicate him involuntarily pursuant to *Sell v. United States*, 539 U.S. 166 (2003), to render him competent. The District Court agreed with the Government and ordered Grape forcibly medicated following a *Sell* hearing. The District Court's order was stayed and Grape filed this

2

interlocutory appeal, claiming that the Government failed to meet its burden of proof on the first two factors of the four-factor test laid out in *Sell*: (1) whether the Government had advanced sufficiently important interests to justify forcible medication, and (2) whether involuntary medication was substantially likely to restore Grape to competency. *Id.* at 180-81. However, Grape subsequently assaulted a corrections officer, and the Government then medicated him involuntarily on account of his dangerousness pursuant to *Washington v. Harper*, 494 U.S. 210 (1990). The District Court later deemed Grape competent. Grape wishes to pursue this appeal because the Government intends to use the District Court's original *Sell* order should Grape again become incompetent. We find that the Government has presented sufficiently important interests to involuntarily medicate Grape, and that the administration of medication to Grape is substantially likely to render him competent to stand trial. For the reasons set forth in further detail below, we will affirm the District Court's order.

I.

On July 12, 2005, a federal grand jury returned a two-count indictment against Grape, charging him with: (1) receiving visual depictions of minors engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2), and (2) knowingly possessing visual depictions of minors engaging in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(4)(B). These charges arose out of Pennsylvania state allegations that between December 2004 and May 2005 Grape brought minors to his bedroom and showed them child pornography while attempting to molest them.

3

## A. Pre-*Sell* Hearing

Grape's first signs of serious mental illness emerged during his ten-year stay in prison, following a 1993 arrest and conviction for the attempted rape of a male minor. Soon after Grape's incarceration in 1995, he was diagnosed with depression but remained mentally stable otherwise. However, beginning in 2000, Grape experienced his first psychotic episode and prison medical staff consequently diagnosed him between then and his 2004 release with paranoid schizophrenia, among a number of other mental disorders. Notably, Grape has a history of noncompliance with prescribed medication, often refusing to take it entirely, dating back to his first imprisonment.

Since Grape's arrest on his current charges, he has been subjected to numerous psychological evaluations. On September 6, 2005, the District Court granted Grape's first motion for a competency hearing, and ordered it to be preceded by a psychological evaluation complete with a prepared report. Because Grape previously filed a notice of insanity defense, the Government filed its own motion for psychiatric examination in response, and on September 16, 2005, the District Court granted the Government's motion to determine if Grape was insane at the time of the offense. As a result of these orders, between November 2 and December 1, 2005, Grape was evaluated at the Metropolitan Correctional Center, in New York, New York ("MCC-NY").

On January 4, 2006, MCC-NY examining psychologist Cristina Liberati, Ph.D., filed a report based on her observations during Grape's stay. Ultimately, she diagnosed Grape in her

4

report as follows: rule-out malingering;[1] alcohol abuse; rule-out schizophrenia, paranoid type; and rule-out pedophilia.[2] Because of Grape's lack of cooperation, she could not definitively diagnose his illness or assess his competency to stand trial.

The District Court granted Grape's second motion for a psychological evaluation on February 6, 2006, and on April 5, 2006, Grape was admitted for evaluation at the Metropolitan Correctional Center in Chicago. Dr. Jason Dana issued his report from this evaluation period on June 23, 2006, in which he expressed frustration with Grape's lack of cooperation and questioned the validity of his psychotic symptoms. Dr. Dana diagnosed Grape with: pedophilia; alcohol dependence; malingering; and rule-out psychotic disorder. Similar to Dr.

---

[1]Dr. Christina Pietz, a forensic psychologist, testified at Grape's June 26, 2007 hearing pursuant to *Sell v. United States*, 539 U.S. 166 (2003), that "malingering" has two possible meanings: "One is that [the patient is] acting, that he's faking a mental illness. But [it] also [includes] individuals that actually suffer from a mental illness and exaggerate the nature of their deficits."

[2]A "rule-out" diagnosis, according to Dr. Pietz's testimony, means there is "evidence that [the patient] may meet the criteria for that diagnosis, but [the doctors] need more information to rule it out." In other words, there is reason to suspect the presence of a "rule-out" psychotic disorder, but the doctor would not be comfortable giving such a diagnosis at that time.

Liberati, Dr. Dana ultimately was unable to determine Grape's competency to proceed to trial and could offer no opinion on Grape's sanity at the time of the offense.

The District Court held a competency hearing on July 20, 2006, and issued an order in response, finding Grape incompetent. Grape was then remanded to the U.S. Medical Center in Springfield, Missouri ("Springfield") for continued psychological evaluation and treatment to begin upon his September 7, 2006 arrival. The District Court set a hearing for Grape pursuant to *Sell*, and thereby ordered Grape's treating doctors to submit a report detailing his diagnosis, the type and dosage of medicine to be administered to him, potential side effects, the appropriateness of the medication, and why less intrusive alternatives were not available.

On February 15, 2007, Dr. Christina Pietz, Ph.D., a forensic psychologist, and Dr. Robert Sarrazin, M.D., the Chief of Psychiatry at Springfield, submitted a report to the District Court regarding their assessment of Grape. In the report, Drs. Pietz and Sarrazin stated that Grape suffers from paranoid schizophrenia and antisocial personality disorder and was mentally incompetent to stand trial at that time. They believed antipsychotic medication would restore Grape to competency, and discussed available medications and their side effects, as well as the overall process and rates of success in restoring competency.

Meanwhile, prior to the June *Sell* hearing, Dr. Carlos Tomelleri, a psychiatrist at Springfield, conducted an

6

examination pursuant to *Harper*[3] on May 15, 2007. Dr. Tomelleri found that Grape was severely mentally ill, diagnosed him with paranoid schizophrenia, and acknowledged that his threatening behavior indicated potential danger to others. However, Dr. Tomelleri conceded that Grape's inappropriate behavior could be adequately managed by the conditions of his confinement at that time. Dr. Tomelleri concluded that Grape therefore could not be involuntarily medicated on the grounds that he was a danger to himself or others under *Harper*, but agreed that medication was in Grape's best interest.

## B. Grape's *Sell* Hearing

On June 26, 2007, the District Court held a *Sell* hearing to determine whether it could authorize the involuntary medication of Grape. The Government presented Dr. Pietz and Dr. Sarrazin as witnesses via video conference from Springfield. Grape also appeared via video conference from Springfield. Grape presented no witnesses.

Dr. Pietz testified that over the course of a few months, she saw Grape several times a week. She believed Grape suffers from paranoid schizophrenia, as demonstrated through his auditory hallucinations, responses to internal stimuli,

---

[3]*Washington v. Harper* allows the involuntary administration of drugs to a prisoner with serious mental illness under limited circumstances if: (1) the inmate is dangerous to himself or others, and (2) the treatment is in the inmate's "medical interest." 494 U.S. 210, 227 (1990).

inappropriate display of emotion, and paranoia. Further, she disputed the prior diagnoses that Grape was malingering, testifying that he was unable to maintain a logical thought process, or showed "cognitive slippage," which is very difficult for a patient to fake, and that he may pretend his mental illness is less severe than it is. Dr. Pietz testified that Grape would benefit from taking antipsychotic medicine for his schizophrenia to "stabilize his mood[,] . . . [diminish his] attending to internal stimuli, . . . and restore his competency." However, Dr. Pietz deferred to Dr. Sarrazin on the specific plan for medicating Grape. Dr. Pietz admitted that she believed that if Grape were not in custody, he could present a danger to himself or others. She agreed that his mental state declined during his stay in Springfield, that his symptoms would likely stay consistent without medication, and that residing in a locked unit would have adverse effects on his mental condition.

Dr. Sarrazin testified second and, given his limited meetings with Grape, relied heavily on Dr. Pietz's observations in reaching his conclusions. Dr. Sarrazin believed that Grape suffers from paranoid schizophrenia and antisocial personality disorder, though he had not seen him hallucinate or respond to internal stimuli, and that Grape's condition did not improve between his February 2007 evaluation and the June 2007 *Sell* hearing. Dr. Sarrazin testified in detail about medicating Grape, and opined that "there is a substantial probability that with antipsychotic medications . . . Grape will be restored to competency to stand trial." Specifically, Dr. Sarrazin hoped medication would help treat Grape's symptoms of disorganized, delusional, and psychotic thought.

8

Dr. Sarrazin reviewed the different types of antipsychotic medications available for Grape generally, comparing first- and second-generation medicines.[4]  He described the treatment available to Grape if he were to voluntarily accept oral medication, expressing a preference for prescribing oral second-generation antipsychotics.  However, presuming that Grape would continue to refuse medical treatment, Dr. Sarrazin proposed a plan for his involuntary medication.  He recommended treating Grape with a first-generation antipsychotic medication called haloperidol,[5] which is available in oral, and short- and long-acting injectable forms.  If Grape refused to take the oral medicine, Dr. Sarrazin proposed starting with a short-acting injectable form, which he would administer daily, not to exceed a week at the maximum.  He hoped that once medicated and "de-escalate[d]" after taking the short-acting injectable drug, Grape would choose to cooperate and take his medicine orally from that point.  Because haloperidol also comes in long-acting injectable form, Dr. Sarrazin would inject Grape with that if the first week of daily short-acting injections did not render him cooperative.  Other oral antipsychotic medications could be administered while the long-

_____

[4]Dr. Sarrazin testified that antipsychotic medicines come in two broad categories right now – first-generation and second-generation medication.  First-generation antipsychotic medication has existed for many years, compared with the relatively new second-generation medicines.

[5]Haloperidol's nongeneric trade name, used interchangeably in the record, is Haldol.

9

acting injectable medication was still potent. Dr. Sarrazin believed Grape would have to be medicated for a minimum of four to six months.

Practically, the forcible medication would happen in the following manner. Medical center nursing staff would first give Grape a chance to take medicine orally; if he refused, they would administer the medicine via an injection. To do so, the nurses would restrain Grape's hands through his food slot, open his cell door, inject him with the medication, leave the cell, and then remove the handcuffs through the food slot. If Grape refused to submit to hand restraints, the nurses would come with a lieutenant, and even a four-cell boot team if necessary. The lieutenant and boot team would open the door and restrain Grape's hands and legs, the nurses would then enter and give the injection (usually in the buttocks), someone from the medical staff would examine Grape for injury, and then the team would leave. A lieutenant would videotape the entire event according to procedure.

Dr. Sarrazin believed "the medications would not have side effects that would significantly inhibit [Grape's] ability to be competent for his trial, [or] to interact with his attorney." If possible side effects such as sedation, lightheadedness, or others occurred, the doctors would no longer deem Grape competent to proceed with his trial and would make changes to his treatment. Other potential side effects include: extrapyramidal side effects ("EPS"), which involve feelings of stiffness; feeling as though one's feet must keep moving (tardive dyskinesia); dry mouth; diabetes or changes in blood glucose levels; involuntary movements of the tongue and mouth; or neuroleptic malignant

10

syndrome, a more serious side effect that affects less than one percent of those treated and causes the body not to be able to regulate its own temperature. These side effects, especially neuroleptic malignant syndrome, EPS or stiffness, and tardive dyskinesia, which could be permanent, are less common in second-generation antipsychotics than in first-generation medicines such as haloperidol. Dr. Sarrazin said Grape would be monitored closely for any of these side effects and believed no alternative or less intrusive treatment would be effective in treating him; counseling or therapy would not have been effective at this stage.

Dr. Sarrazin testified that the Bureau of Prisons has approximately a 70% success rate in restoring forcibly medicated defendants to competency, and that the numbers at Springfield roughly mirror that statistic, estimating a 70 to 75% success rate for his facility. However, Dr. Sarrazin acknowledged that the success rate in restoring patients to competency "is a little bit lower for people that have to be forcibly medicated than for people who do not," including individuals who are "uncooperative with our treatment and . . . [those] more seriously mentally ill[, including those who] do not believe they are mentally ill," such as Grape. Overall, Dr. Sarrazin testified that his proposed method of treatment is medically appropriate for Grape, that this treatment is in Grape's "best medical interests," and that his condition would "most likely" continue to deteriorate, and would not improve, absent medication.

On cross examination, Dr. Sarrazin agreed that Grape could potentially cause harm to others if he were placed among

the open population at the medical facility. He also conceded that Grape repeatedly threatened Dr. Pietz and that if Grape were released onto the street, he could harm a member of the public at large. However, Dr. Sarrazin emphasized that he had no way of knowing whether Grape would be civilly committed if he could not be restored to competence.

The District Court filed its opinion on September 6, 2007, granting the Government's request to involuntarily medicate Grape in order to restore him to competency to stand trial. Grape timely filed his notice of appeal to the District Court's order.

## C. Post-*Sell* Hearing

After Grape's *Sell* hearing, his mental condition continued to deteriorate, and on October 25, 2007, Grape physically and verbally assaulted a Springfield correctional officer. Springfield held a *Harper* hearing that day, during which it determined that Grape qualified for forcible medication under the *Harper* standard because he presented a danger to others and the treatment was in his medical interest. *See* 494 U.S. at 225-27. Staff began forcibly medicating Grape immediately. According to the Government, Grape's understanding and behavior improved significantly over the course of his first months on antipsychotic medications. As of April 2, 2008, the warden of Springfield deemed Grape competent to stand trial, as noted in a letter to the District Court. The District Court subsequently found Grape competent to stand trial and ordered him discharged from Springfield to the Erie County Prison in Erie, Pennsylvania.

12

Grape acknowledges that although he was deemed competent to stand trial, he voluntarily stopped taking his antipsychotic medication at the end of June 2008, and has received no antipsychotic medicine since that time. In fact, at oral argument, Grape's counsel represented that he had recently met with Grape and already witnessed him exhibiting signs of cognitive slippage. Grape's counsel also reported that while on the antipsychotic medication, Grape suffered terrible side effects, including shaking, body aches, and EPS. Recognizing that the state of his competency is not static, Grape therefore wishes to maintain this appeal in the event that he again becomes incompetent and the Government attempts to use the original District Court order to forcibly medicate him. The Government has not indicated that it would not use the District Court order to involuntarily medicate Grape in the future if the need arises.

II.

A. Jurisdiction

We have jurisdiction over the District Court's order allowing the Government to forcibly medicate Grape pursuant to 28 U.S.C. § 1291, under the collateral order doctrine exception. *See Sell*, 539 U.S. at 175-77; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468-69 (1978); *Cohen v. Benefit Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

Additionally, we must resolve the issue of mootness before we exercise jurisdiction and proceed to the merits of this case. *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).

13

Despite Grape's restored competency, brought to our attention only weeks before oral argument, his appeal is not moot because it meets the necessary factors under the "voluntary cessation" exception. Under this doctrine, mootness is not presumed if the respondent has stopped the offending action, but may resume it at any time. *De Funis v. Odegaard*, 416 U.S. 312, 318 (1974).

Grape has an ongoing illness and retains an interest in the present appeal. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000). Although the Government has not yet medicated Grape involuntarily subject to *Sell*, under the appealed District Court order, nothing prevents it from doing so at any time the District Court again deems Grape incompetent to stand trial. Thus, the Government is "is free to return to [its] old ways" whenever it desires. *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Grape's appeal before us therefore is not moot, and we have jurisdiction to review it.[6]

## B. Standards of Review

The *Sell* Court did not specify a standard for reviewing *Sell* orders, and because this is a matter of first impression in

---

[6]The Government also admitted at oral argument that it had not received the updated September 12, 2008 forensic report stating that Grape was refusing to take his antipsychotic medication at the time it filed its September 11, 2008 motion to dismiss for lack of jurisdiction. Accordingly, the Government agreed to withdraw its motion to dismiss, conceding that the issues in Grape's appeal are not moot.

14

this Court, we must first determine the appropriate standards of review. Several of our sister circuits have specified standards of review for each factor of the *Sell* test. Grape appeals the District Court's determination on two of the four *Sell* factors.

All courts of appeals that have addressed this issue review the first *Sell* factor as a legal question subject to de novo review. *See, e.g., United States v. Hernandez-Vasquez*, 513 F.3d 908, 915-16 (9th Cir. 2007).[7] Because we agree that the first issue presents a legal question, we will review the first *Sell* factor – whether the Government has advanced sufficiently important interests to justify forcible medication – de novo. *Sell*, 539 U.S. at 180.

The Supreme Court and this Court have similarly not addressed the standard of review for the second *Sell* factor – whether involuntary medication is substantially likely to restore Grape to competency. *Id.* at 181. All but one of the other courts of appeals that have faced this issue agree that *Sell* factors two through four present factual questions subject to clear error

[7]*See also United States v. Green*, 532 F.3d 538, 546 (6th Cir. 2008) (reviewing the first *Sell* factor de novo); *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007) (same); *United States v. Bradley*, 417 F.3d 1107, 1113-14 (10th Cir. 2005) (same); *United States v. Evans*, 404 F.3d 227, 236 (4th Cir. 2005) (same); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004) (same).

15

review. *See, e.g., Hernandez-Vasquez*, 513 F.3d at 915-16.[8] Determining whether "involuntary medication will *significantly further* [the proffered] state interests," *Sell*, 539 U.S. at 181, including the medication's likely effect on a defendant and his ability to stand trial and help prepare for it, requires us to resolve a factual question. We therefore review the second *Sell* factor for clear error, and defer to the District Court's findings of fact.

Further, all courts of appeals addressing this issue have held that the Government bears the burden of proof on factual questions by clear and convincing evidence. *See, e.g., United States v. Gomes*, 387 F.3d 157, 159 (2d Cir. 2004) (applying and requiring the Government to meet the "clear and convincing evidence" standard previously articulated in *Riggins v. Nevada*, 504 U.S. 127, 134 (1992), as to the factual findings in *Sell* factors two through four).[9]

---

[8]*See also Green*, 532 F.3d at 551-52 (holding that *Sell* factors two, three, and four are factual questions reviewed for clear error); *Palmer*, 507 F.3d at 303 (same); *Evans*, 404 F.3d at 240 (same); *Gomes*, 387 F.3d at 160 (same). *But see Bradley*, 417 F.3d at 1113-14 (holding that both *Sell* factors one and two are legal, or mixed legal and factual, questions subject to de novo review).

[9]*See also Green*, 532 F.3d at 545 ("A *Sell* order requires the government to present clear and convincing evidence of [the factual components of each of the four factors]."); *Bradley*, 417 F.3d at 1114 (agreeing that *Sell* factors two through four are factual findings that the Government must prove by clear and

16

III.

## A.  The *Sell* Framework

In the instant appeal, Grape seeks relief from the District Court's order allowing the Government to forcibly medicate him to render him competent to stand trial pursuant to *Sell*, but the Government already forcibly medicated him in Fall 2007 pursuant to *Harper*.  *Harper* allows the involuntary administration of drugs to a prisoner with serious mental illness under limited circumstances if:  (1) the inmate is dangerous to himself or others, and (2) the treatment is in the inmate's "medical interest."  494 U.S. at 227.  In deciding *Harper*, the Supreme Court found that although an inmate "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," this interest can be overcome by a "legitimate" and "important" government interest in "providing appropriate medical treatment to reduce the danger" the inmate presents.  *Id.* at 221-22, 236.

We do not reach consideration of the four-factor *Sell* test unless an inmate does not qualify for forcible medication under *Harper*, as determined at a *Harper* hearing generally held within

convincing evidence); *Evans*, 404 F.3d at 236 n.5 (stating that Evans argued that the "Due Process Clause requires the Government to prove its case under *Sell* by clear and convincing evidence," but that in failing to raise this argument before the district court, he waived it on appeal).

17

the inmate's medical center. Because Dr. Tomelleri found at Grape's first *Harper* hearing in Spring 2007 that he did not meet the *Harper* standard for involuntary medication, the Government continued to pursue Grape's forcible medication through *Sell*. We distinguish here between the two methods of involuntary medication because, although Grape appeals only his *Sell* order, the details of his eventual medication pursuant to *Harper*, as determined at his Fall 2007 *Harper* hearing, are relevant to our *Sell* analysis.

In *Sell*, the Supreme Court explicitly allowed the forcible medication of an inmate "solely for trial competence purposes" in certain "rare" instances. 539 U.S. at 180. The Court set a standard that the government must meet in order to overcome the inmate's liberty interest, as laid out in a four-factor test. First, "a court must find that *important* governmental interests are at stake," though "[s]pecial circumstances may lessen the importance of that interest." *Id.* Second, "the court must conclude that involuntary medication will *significantly further* those concomitant state interests." *Id.* at 181. This includes finding that "administration of the drugs is substantially likely to render the defendant competent to stand trial," and "[a]t the same time, . . . that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* Third, "the court must conclude that involuntary medication is *necessary* to further those interests" and that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.* Fourth, and finally, "the court must conclude that administration of the drugs is *medically appropriate*, *i.e.*, in the

18

patient's best medical interest in light of his medical condition." *Id.* The Court then emphasized that the goal of this test is "to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant *competent to stand trial.*" *Id.*

In this appeal, Grape challenges only the first two *Sell* factors, arguing that the Government has not met its burden on either. This is an issue of first impression in this Court.

B. Sufficiently Important Government Interests

Grape first argues that the District Court erred because the Government did not satisfy factor one of the *Sell* test, which is a legal determination that we review de novo. As instructed by the Supreme Court, a reviewing court's role regarding this first factor is to determine whether "*important* government interests are at stake," while "consider[ing] the facts of the individual case in evaluating the [strength of the] Government's interest." *Id.* at 180.

To evaluate the strength of the Government's case, the *Sell* Court stated that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important . . . [,] whether the offense is a serious crime against the person or a serious crime against property." *Id.* Courts of appeals have split on which test to employ in determining seriousness of the crime. Some look to the maximum statutory penalty, while others calculate the defendant's probable sentencing range under

19

the U.S. Sentencing Guidelines ("Guidelines"). *See Hernandez-Vasquez*, 513 F.3d at 917-19.

Whether Grape's alleged crimes are serious is not in question. He faces statutory mandatory minimum sentences of fifteen years for his receipt offense and ten years for his possession offense, accounting for his prior conviction for attempted rape. 18 U.S.C. § 2252(b)(1), (b)(2). The District Court assessed Grape's crimes in light of his criminal history category of III and found that, if guilty, his "best case scenario" punishment is likely 87 to 108 months' imprisonment under the Guidelines, though he would still be subject to the statutory minimum sentences. Grape thus concedes that his offenses qualify as serious under either test, and we agree.

Additionally, we "must consider the facts of the individual case in evaluating the Government's interest in prosecution," remembering that "[s]pecial circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180. One significant mitigating circumstance for Grape is the possibility of his civil confinement, upon which the *Sell* Court elaborates: "The defendant's failure to take drugs voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill – and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.*

The long-term prognosis for Grape's currently restored mental state is unclear, which affects the likelihood of his potential future civil confinement. We therefore presume that Grape would mentally deteriorate if not medicated, and proceed

20

under this assumption. Grape argues that under 18 U.S.C. § 4241(d), the statutory method of determining mental competency to stand trial, if he is not medicated and therefore not competent, he becomes subject to the provisions of 18 U.S.C. § 4246. Section 4246 provides the method for handling a defendant once he is determined incompetent. The District Court would first need to

find[] by clear and convincing evidence that the person is presently suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, [in which case] the court shall commit the person to the custody of the Attorney General. The Attorney General shall release the person to the appropriate official of the State in which the person is domiciled or was tried if such State will assume responsibility for his custody, care, and treatment. The Attorney General shall make all reasonable efforts to cause such a State to assume such responsibility. If, notwithstanding such efforts, neither such State will assume such responsibility, the Attorney General shall hospitalize the person for treatment in a suitable facility, until –

(1) such a State will assume such responsibility; or

21

> (2) the person's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment would not create a substantial risk of bodily injury to another person or serious damage to property of another;

whichever is earlier.

18 U.S.C. § 4246(d). Further, Pennsylvania has its own provisions for handling an incompetent inmate, if federal authorities were to release Grape into state custody. The relevant Pennsylvania statute states:

> Whenever a person is severely mentally ill and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself. . . . If . . . the person has been found incompetent to be tried or has been acquitted by reason of lack of criminal responsibility on charges arising from conduct involving infliction of or attempt to inflict

22

substantial bodily harm on another, . . . clear and present danger to others may be shown by establishing that the conduct charged in the criminal proceeding did occur, and that there is a reasonable probability that such conduct will be repeated. [A] clear and present danger of harm to others may be demonstrated by proof that the person has made threats of harm and has committed acts in furtherance of the threat to commit harm.

70 Pa. Cons. Stat. § 7301. Prior to Grape's forcible medication in Fall 2007, he most likely fell within the category of individuals to whom this rule would apply if he were released in Pennsylvania. In response to Grape's arguments under these federal and state statutes, the District Court found that "[e]ven though a section 4246 hearing has not been held, there is no serious dispute that the likelihood of Mr. Grape reentering society unmedicated is extremely low." Likewise, we believe it is safe to assume that Grape would likely reenter this category if his paranoid schizophrenia returned.

The District Court further found that "there is no . . . reading of the Medical Center's *Harper* hearing conclusion other than, but for his confinement, Mr. Grape would be a danger." In fact, we now know that, despite his confinement, Grape when not medicated already posed a danger. Grape argues that his apparently indefinite future civil confinement decreases the need for his forcible medication to the point of it becoming negligible. It is impossible for us to predict how likely it is that Grape will relapse and again exhibit the same

23

dangerous symptoms that would bring him within the scope of these civil confinement statutes. Grape's currently restored mental state weakens his argument. Yet, despite these recent developments in Grape's health, it is not difficult to agree with the District Court's assessment that "the likelihood of civil commitment here does diminish the government's interest in this case."

But we must balance Grape's strong argument against the Government's interests. In that vein, the *Sell* Court states:

> We do not mean to suggest that civil commitment is a substitute for a criminal trial. The Government has a substantial interest in timely prosecution. And it may be difficult or impossible to try a defendant who regains competence after years of commitment during which memories may fade and evidence may be lost. The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution. The same is true of the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed, see 18 U.S.C. § 3585(b)). Moreover, the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one.

539 U.S. at 180.

24

In the instant case, the Government argues that a number of factors increase its interest in prosecuting Grape. First, we have recognized the seriousness of child pornography charges. *See United States v. Goff*, 501 F.3d 250, 258-60 (3d Cir. 2007) (highlighting the seriousness of and harm associated with the use of child pornography). Also, Grape allegedly committed child sex offenses within months of his discharge from prison for his attempted rape, making him a repeat offender and indicating a pattern of pedophilia. Further, the Government asserts that the sheer strength of its interest in prosecuting Grape decreases the ability of Grape's special circumstances to overcome those Government interests. The Government has a strong case on the basis of these arguments.

The Government also argues that it has a strong interest in prosecuting Grape sooner, while the evidence is fresh, but we do not find this convincing alone. Grape states, importantly, that his computer is the source of the evidence against him, which would be available whenever he is prosecuted. However, the Government argues regarding Grape's sentence that if he were never convicted and served a period of time in civil confinement instead, he would not face the potential of a portion of his punishment through supervised release. This would allow the Government to continue to track him after his stay in prison. Finally, at oral argument, the Government also expressed an interest in trying Grape earlier because one of its goals is to involve crime victims in the prosecution process.

We review this first *Sell* factor de novo. Other courts of appeals in analyzing this factor have relied almost entirely on an assessment of the seriousness of the defendant's crime. *See*,

25

*e.g.*, *United States v. Green*, 532 F.3d 538, 545-51 (6th Cir. 2008). Also, Grape has been confined on his current charges for approximately three-and-a-half years. In light of the mandatory minimum sentences of ten and fifteen years he faces, Grape would still need to serve a majority of his sentence if convicted. The Government has demonstrated the strength of its interest in speedy prosecution with support from its additional enumerated important interests.

We recognize that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229. The fact that Grape has already been involuntarily medicated and has been restored to competency diminishes his countervailing interest. Of course, there is a strong possibility that he will again relapse to incompetency due to his paranoid schizophrenia. Grape argues that as more time lapses from the time he stopped taking his medication, he will move closer to incompetency and to his previous degree and symptoms of mental disease. But, due to the volatility of Grape's mental state, we cannot be certain of Grape's current mental health, or the likelihood and timeline under which he would again become incompetent.

Therefore, we are not in a position to agree wholeheartedly with Grape's statement that we "need not override [his] constitutionally protected liberty interest in refusing medical treatment when the end result of forcible medication will be the same as allowing the individual to continue to refuse treatment." It is no longer clear that Grape's punishment – incarceration, whether in prison or a medical

26

facility – would be the same whether or not he were involuntary medicated.  Regardless, the District Court stated that it had "no trouble concluding that important government interests are at stake here."  We agree, and find that Grape's arguments do not outweigh the Government's.[10]  Therefore, the Government's interest is sufficiently strong to outweigh Grape's liberty interest and to meet this factor of the *Sell* test.

### C.  Substantial Likelihood of Medication to Restore Competency

Grape also argues that the District Court erred in finding for the Government on factor two of the *Sell* test, which we review for clear error.  The *Sell* Court describes factor two as follows:

> Second, the court must conclude that involuntary medication will *significantly further* those concomitant state interests.  It must find that administration of the drugs is substantially likely to render the defendant competent to stand trial.

---

[10]We also recognize, however, that Grape's forced medication pursuant to *Harper* before our decision in the instant appeal altered the facts of his case.  Therefore, we decline to reach whether Grape's potential for indefinite civil confinement on the facts prior to his *Harper* medication would have sufficed under the first *Sell* factor to overcome the Government's stated interests.  We limit our holding here to the facts of Grape's individual case, as presented to us at the time of our decision.

27

At the same time, it must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair.

*Sell*, 539 U.S. at 181. The clear error standard of review is important to our analysis of this issue. This Court has defined clear error review as follows:

We accept the district court's findings of fact unless they are clearly erroneous. A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is "left with a definite and firm conviction that a mistake has been committed." Thus, even if we might have come to different factual conclusions based on this record, we defer to the findings of the district court unless we are convinced that the record cannot support those findings.

*Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1220 (3d Cir. 1993) (citations omitted) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). The Government bears the burden of establishing the second *Sell* factor by clear and convincing evidence. *See Gomes*, 387 F.3d at 159. The District Court declared this part of its analysis the "central question in this case[, i.e.,] whether medication is substantially likely to restore Mr. Grape's competency."

Grape challenges the District Court's holding on this factor in two ways. First, he challenges the sufficiency of the evidence before the District Court to find that he was in fact "substantially likely" to return to competence if administered such antipsychotic drugs. The parties debated over the testifying doctors' evidence that the Government showed such a substantial likelihood through Dr. Pietz's testimony that "the Bureau [of Prisons] has approximately a 70 percent success rate in restoring involuntarily medicated defendants to competency." Yet, Dr. Sarrazin later acknowledged that the Bureau's "success in restoring competency is a little bit lower for people that have to be forcibly medicated than for people who do not," such as Grape, because they are "uncooperative with [their] treatment[,] . . . have absolutely no insight into their illness[,] do not believe they are mentally ill[, and] are oftentimes sicker individuals."

Second, Grape argues that the District Court "fail[ed] to appreciate that the government had the burden of proof on this issue, and therefore any lack of evidence to support a finding that forcible medication was substantially likely to render Mr. Grape competent to stand trial had to be resolved against the government, not [for] the government." Grape has not shown that the District Court clearly erred in accepting the doctors' testimony that antipsychotic medication would be substantially likely to render him competent to stand trial.

However, we can dispose of Grape's hypothetical arguments as to *Sell* factor two by referring to the facts of what actually happened after the Government forcibly medicated him

29

pursuant to *Harper*.[11]    Both the District Court and the Springfield staff found that the medications restored Grape to competency.    Regardless of whether the District Court "abdicat[ed] its fact-finding role," or failed to hold the Government to its burden of proof, this tangible evidence shows that "involuntary medication will *significantly further* those concomitant state interests" by being "substantially likely to render [Grape] competent to stand trial," yet also being "substantially unlikely" to have detrimental side effects affecting Grape's trial preparation.    *Sell*, 539 U.S. at 181.

----

[11]The District Court's analysis, of course, did not consider the actual results of Grape's forcible medication with antipsychotic drugs.    However, "it would be pointless to remand the case simply to have the District Judge take notice of that which we may notice ourselves."    *United States v. Remoi*, 404 F.3d 789, 793 n.1 (3d Cir. 2005); *see also Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute . . . [and such a] fact must either be generally known within the jurisdiction of the trial court, or be capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." (citing Fed. R. Evid. 201)); *In re Indian Palms Assoc., Ltd.*, 61 F.3d 197, 205-06 (3d Cir. 1995) ("Judicial notice may be taken at any stage of the proceeding, including on appeal, as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." (citations omitted)).

Thus we need not consider the research and scientific and empirical evidence the parties debated regarding the likelihood that antipsychotic medications would restore Grape to competency.[12] We now know that Grape most probably suffers from paranoid schizophrenia, and definitely is responsive to medicinal treatment for such a diagnosis. Further, although we find that Grape did suffer side effects while taking antipsychotic medications, we have limited information on the exact side effects and their severity. Based on the parties' representations and the subsequent District Court finding of Grape's competency to stand trial, we assume that although Grape suffered some side effects, they were not sufficient to "interfere significantly with [his] ability to assist counsel in conducting a trial defense." *Sell*, 539 U.S. at 181. Therefore, the Government has met its burden by clear and convincing evidence that, if medicated involuntarily, Grape is substantially likely to have his competence restored. For the above reasons, the District Court did not clearly err in coming to the conclusion it did.

------

[12]The debate between the parties in their briefs hinges around the 70% restoration of competence statistic, whether that alone reaches a sufficient likelihood of restoration, and how far under that threshold Grape falls. We find this inconsequential because the tangible evidence garnered from Grape's actual forcible medication resolves the issue over which the parties disputed – whether the medication plan outlined by Dr. Sarrazin would be substantially likely to restore Grape to competence with limited side effects. The plan did in fact restore Grape to competence with limited side effects.

31

## IV.

For all of the above reasons, we conclude that, pursuant to *Sell*, the Government has presented sufficiently important interests to forcibly medicate Grape, and that the administration of medication to Grape is substantially likely to render him competent to stand trial, and unlikely to produce side effects that may prevent him from helping prepare for his trial. Therefore, we will affirm the District Court's order.