**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-4017

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ERIC BRIAN BROWN,

Defendant – Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at
Norfolk.  Raymond A. Jackson, District Judge.  (2:18-cr-00194-RAJ-LRL-1)

Argued:  May 18, 2020                                    Decided:  August 14, 2020

Before THACKER and RICHARDSON, Circuit Judges, and Kenneth D. BELL, United
States District Judge for the Western District of North Carolina, sitting by designation.

Remanded with instructions by unpublished opinion.   Judge Bell wrote the opinion, in
which Judge Thacker and Judge Richardson joined.

**ARGUED:**  Andrew William Grindrod, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Norfolk, Virginia, for Appellant.  Emily Rebecca Gantt, OFFICE OF THE
UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.  **ON BRIEF:**  Geremy
C. Kamens, Federal Public Defender, Alexandria, Virginia, Lindsay Jo McCaslin,
Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Norfolk, Virginia, for Appellant.  G. Zachary Terwilliger, United States Attorney, Aidan
T. Grano, Assistant United States Attorney, Alexandria, Virginia, Randy C. Stoker,

Assistant United States Attorney, Kevin M. Comstock, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

BELL, District Judge:

Eric Brown was indicted in 2018 for kidnapping resulting in death, assault with intent to commit aggravated sexual abuse and other crimes against nineteen year old Ashanti Billie, who was working on a military base in Norfolk, Virginia when she was allegedly abducted. However, no trial has been held on these serious charges because Brown is not mentally competent to stand trial. In an effort to bring Brown, who has consistently refused psychiatric medication, to competency, the government successfully sought an order from the district court under the authority of *United States v. Sell*, 539 U.S. 166 (2003), to allow Brown to be involuntarily medicated. Brown filed this appeal to challenge the entry of that *Sell* order, which the district court stayed pending appeal.

On May 14, 2020, four days before oral argument, the government notified the Court of a significant change in Brown's circumstances. Beginning in April 2020, the staff at the Federal Medical Center Butner ("Butner") "observed a significant deterioration in Brown's functioning" and, starting on May 12, 2020, administered to Brown additional daily psychiatric medication under a separate district court order that allowed Brown to be involuntarily medicated for his own health and the safety of others under *Washington v. Harper*, 494 U.S. 210 (1990). With this additional medication, the treatment regimen now being administered to Brown involves the same two medications authorized by the *Sell* order, although the *Sell* order may allow a higher dosage for one of the drugs. In other words, the government's medication of Brown under *Harper* has now effectively put in place a version of the *Sell* order for an undetermined length of time.

3

Accordingly, the threshold issue for this Court is whether it should move forward to now decide the merits of Brown's *Sell* order on the current record or remand the case to the district court to reconsider its *Sell* order in light of these changed circumstances. For the reasons discussed below, the Court finds that the case should be remanded to the district court to evaluate this still developing new evidence and its effect, if any, on the *Sell* order in the first instance, while maintaining the stay of that order.

I.      **Factual and Procedural History**

A.      Brown's Early Medical History

Eric Brown served in the United States Navy for twenty-one years as an Information Systems Technician.[1] During his military service, Brown experienced his first psychotic episode. In 2000, Brown was hospitalized for schizophrenia and prescribed a combination of two antipsychotic drugs, chlorpromazine and olanzapine. Brown's medical records indicate he had elevated liver enzymes during his hospitalization and his doctors at the time recommended that he not be put on olanzapine again.[2] Brown was discharged from the

---

[1] Brown's military service is relevant to the charges against him. The indictment alleges that Brown abducted Billie from a Blimpie's fast food restaurant on a naval base in Norfolk, Virginia. Brown had participated as a laborer in the construction of the restaurant and frequently ate there after it opened, using his access to the base as a military retiree. The indictment further alleges that Brown is tied to Billie's death by, among other evidence, the presence of his DNA on clothes found with her body, which was discovered eleven days after her disappearance near a wooded area outside of Charlotte, North Carolina, near Brown's childhood home.

[2] There is a dispute among the most recent testifying medical experts based on Brown's medical records whether that side effect might be attributable to the chlorpromazine rather than the olanzapine.

hospital mentally stable and on no medications and went on to serve in the Navy on active duty for eleven more years, retiring in 2011. His second psychiatric episode occurred in 2011 and 2012, when Brown's sister reported paranoid behavior that led her to petition for his involuntary psychiatric evaluation.

B.     Arrest, Commitment and Initial Medication under *Harper*

The government filed a criminal complaint charging Brown with kidnapping on November 7, 2017, and he was arrested the next day.[3] While in federal pretrial detention, Brown attempted suicide and exhibited bizarre behavior, which led the government to move for a psychiatric exam on December 1, 2017.   The district court granted the government's motion on December 15, 2017, and, pursuant to 18 U.S.C. § 4247(b), ordered Brown to be committed to an appropriate Bureau of Prison ("BOP") facility for an initial competency assessment. That assessment diagnosed Brown with "[s]chizophrenia, with catatonia, and paranoid and disorganized features" and noted that Brown has "consistently refused psychiatric medication." Then, with the agreement of Brown's counsel, the district court ordered Brown to be committed to the custody of the Attorney General and hospitalized pursuant to 18 U.S.C. § 4241(d) on January 25, 2018.  Pursuant to this order and 18 U.S.C. § 4241(d)(1), Brown was admitted to Butner on February 8, 2018.

---

[3] Following Brown's commitment and the related proceedings discussed, *infra*, the grand jury returned a three-count indictment against Brown on December 19, 2018, and a six-count superseding indictment on October 2, 2019. The superseding indictment charged Brown with kidnapping resulting in death; three assault charges, including assault with intent to commit aggravated sexual abuse and sexual abuse; theft; and stalking.

5

On May 25, 2018, Brown slipped out of a chain restraint, postured as if to strike it at an officer, and refused to return the restraint. Butner staff then administered a single emergency dose of haloperidol, a psychiatric medication, which calmed Brown. After an administrative hearing on June 1, 2018, BOP determined that involuntary medication was appropriate because Brown was "dangerous to self or others" and "gravely disabled." Brown contested the BOP's decision, and the district court held a hearing on June 21, 2018, at which it found that forcible medication was warranted under *Harper*.

After the *Harper* hearing, Brown began receiving 100 milligrams of haloperidol once every two weeks. A series of reports and hearings then followed over the next six months during which Brown's commitment was extended, but he did not attain competency. In December 2018, a BOP doctor submitted a report opining that Brown had attained competency. She noted that Brown had been moved to open population, was functioning independently, and took the biweekly 100 milligram Haldol injections without resistance. Butner's warden then filed a certificate of restoration of competency under 18 U.S.C. § 4241(e) on December 10, 2018.

A competency hearing was scheduled for March 27, 2019. Prior to that hearing, Brown's haloperidol dosage was briefly reduced to 75 milligrams which led to "a significant decline in his mental functioning" and a quick return to the higher dosage. Also, Brown's pre-competency hearing interviews with both his own and the government's medical experts revealed that he "continue[d] to manifest symptoms of serious psychiatric illness," and the BOP withdrew its certification of competency. Without objection from

6

either party, the district court cancelled the competency hearing and ordered Brown committed to Butner for an additional 120 days, through July 18, 2019.

### C. The *Sell* Order

On July 10, 2019, Butner's warden requested that the district court hold a hearing to determine whether Brown should be forcibly medicated for competency under *Sell*. The government explained that Brown "has reached a level of psychiatric treatment that has been successful in addressing the concern that he is gravely disabled or an imminent risk of danger to himself or others;" however, "increasing medication or adjusting medication without his consent would only be to address the issue of competency to stand trial," so "the only mechanism by which the BOP is able to pursue his treatment is for this Court to make a ruling within the parameters established in *Sell v. United States*." Again, without objection from Brown, the district court extended Brown's commitment for an additional 120 days, ordered the government to file its proposed treatment plan under *Sell* and scheduled a *Sell* hearing. Prior to the *Sell* hearing, the government notified the district court that it would not seek the death penalty.

The *Sell* hearing was held on December 10, 2019. The two witnesses at the full-day *Sell* hearing were Dr. Logan Graddy, Butner's chief psychiatrist, and Brown's medical expert, Dr. George Corvin, a psychiatrist. Among other options, Dr. Graddy proposed to treat Brown with a combination of two antipsychotic medications, administered by injection. One medication was haloperidol, which was to be maintained on Brown's then current regimen of a biweekly 100 milligram dose of long-acting medication. The second medication was olanzapine. Dr. Graddy proposed beginning with daily injections of a

7

short-acting olanzapine, carefully monitoring any side effects, and then only if appropriate, transitioning to a long-acting formulation.

The two experts disagreed on whether this two drug medication plan was, under the *Sell* test, "substantially likely" to bring Brown to competency, when taking haloperidol to treat his schizophrenia[4] for approximately a year and a half had not restored him to competency. Also, the doctors disagreed on whether the addition of olanzapine would cause Brown to be sedated to a point where he would not be able to assist counsel in his defense (and thus would not be competent to stand trial). Finally, the doctors disagreed on whether the government's proposed *Sell* treatment plan was medically appropriate. In particular, Dr. Corvin questioned whether administering olanzapine to Brown would raise his liver enzymes to a dangerous level based on Brown's earlier experience with the drug.

Broadly crediting Dr. Graddy's testimony, the district court entered a *Sell* order on December 23, 2019, permitting the government to involuntarily medicate Brown in accordance with Dr. Graddy's proposed two drug treatment of haloperidol and olanzapine. The district court found that this treatment plan was "substantially likely" to restore Brown's competency and that the plan, which included careful monitoring of potential side effects, was medically appropriate. On that final issue, the court noted that it "reject[ed] the contention that allowing Brown to languish in a state of controlled delusion is in his

---

[4] According to Dr. Graddy, Brown's diagnosed schizophrenia is a "severe mental illness" that often causes hallucinations, delusions, and disorganized speech and behavior. He further testified that left untreated schizophrenia is associated with a thirty-year reduction in life expectancy.

best medical interest."[5] The district court thereafter granted Brown's request to stay its *Sell* order pending appeal, and Brown noted this appeal on January 2, 2020.

D.  Brown's Further Medication under *Harper*

According to medical records provided to the government's counsel on May 13, 2020, beginning in April 2020, the staff at Butner observed that Brown's functioning had significantly deteriorated and they transferred him to a more restrictive housing unit in mid-April. When his condition did not improve, Dr. Graddy ordered additional medication to be given to Brown "for his health and the safety of others" under the district court's earlier *Harper* order. Specifically, he prescribed 10mg of olanzapine to be administered daily by injection for two weeks, in addition to his continued biweekly 100mg dose of haloperidol. Brown received his first dose of olanzapine on May 12, 2020. The Government notified the Court of this information on May 14, 2020, and oral argument was held in this appeal on May 18, 2020.

II.  **Discussion**

"[T]he forcible administration of antipsychotic medication constitutes a deprivation of liberty in the most literal and fundamental sense." *United States v. Watson*, 793 F.3d 416, 419 (4th Cir. 2015), citing, *Riggins v. Nevada*, 504 U.S. 127, 134 (1992); *Harper*, 494

---

[5] The district court also found that the government had established an important interest in prosecuting the case because "the charges at issue in this case are among the most serious in federal criminal law" and that no less-intrusive option was available to restore Brown, finding "the involuntary administration of different antipsychotic medication [is] essential for competency restoration." Brown does not challenge either of these holdings on appeal.

U.S. at 229. Accordingly, this Court has cautioned that the forcible administration of antipsychotic medication "for the sole purpose of rendering [a defendant] competent to stand trial ... is the exception, not the rule" and that "courts must be vigilant to ensure that such orders, which carry an unsavory pedigree, do not become routine." *Id.* (internal quotation marks omitted).

The demanding standard for considering requests by the government to involuntarily medicate incompetent defendants in an effort to make them competent to stand trial was established in *Sell,* almost two decades ago. In *Sell*, the Supreme Court held that involuntary administration of antipsychotic medication for the sole purpose of restoring a mentally ill defendant to competency is appropriate only if the court finds that: (1) "important governmental interests are at stake"; (2) "involuntary medication will significantly further those concomitant state interests"; (3) "involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate." *Sell*, 539 U.S. at 180-81. In this appeal, Brown admits that the government has proven the first and third *Sell* factors but challenges the district court's findings under the second and fourth *Sell* factors.

As discussed briefly above, the threshold issue before this Court is how it should respond to Brown's changed circumstances and the addition of olanzapine to Brown's medication, which effectively puts in place the two drug treatment plan approved by the district court's *Sell* order. The government argues that the Court can and should affirm the *Sell* order despite this new information but suggests that if the Court determines that the evidence warrants further review that the case be remanded to the district court without

10

vacating the *Sell* order. Brown in turn asks the Court to immediately vacate the *Sell* order and remand the case to the district court, which would require that the *Sell* process be started anew if the government desired to again pursue a *Sell* order.

With due regard for the roles of our Court and the district courts and judicial efficiency, this Court will allow the district court to address this new information as an initial matter prior to any appellate review of the merits of the current *Sell* order. "[F]actfinding is the basic responsibility of district courts, rather than appellate courts, …" *Pullman-Standard v. Swint*, 456 U.S. 273, 291-92 (1982), quoting, *DeMarco v. United States*, 415 U.S. 449, 450, n. (1974). Accordingly, where the circumstances under which a district court has entered an order may have materially changed while the matter is on appeal, the circuit court should carefully consider returning the case to the district court so that the district court can find the facts related to those changed circumstances and determine whether its initial order is still appropriate in light of the new information. The situation here demands such a remand.

Both the government and Brown agreed at oral argument that the administration to Brown of the proposed second drug olanzapine will, at a minimum, be informative on a number of the disputed issues related to the *Sell* order and, depending on Brown's experience on the drug, may be determinative. For example, Brown asserts that taking olanzapine together with haloperidol will sedate him further to a point where he could not assist counsel in his own defense (thus precluding administration of the medication under *Sell*). Now that Brown is taking the two drugs together, the district court will be able to consider how Brown's level of sedation has changed with the addition of the olanzapine.

11

If his level of sedation has improved or stayed the same then that might ameliorate that concern, but if, on the other hand, Brown is sleeping twenty hours a day because of the medications then the current *Sell* order may need to be abandoned or revised. Similarly, the primary disputed issue with respect to the medical appropriateness of the *Sell* order is whether the administration of olanzapine will elevate Brown's liver enzymes. Again, Brown's experience with taking olanzapine will be highly instructive; that is, did the medication dangerously elevate his liver enzymes?

To be sure, because of the uncertain duration of Brown's deteriorated mental condition[6] and his response to the medications, it is not known how long Brown will be taking olanzapine and in what dosage under the *Harper* order. Thus, the import of Brown's experience with the drug may be limited (and, of course, possibly disputed). However, this is precisely the type of detailed and nuanced fact-finding inquiry that is the primary responsibility and role of the district court rather than this appellate Court. Therefore, the district court should address this new information in the first instance.[7]

---

[6] Indeed, Brown's deteriorated mental condition and functioning may itself fundamentally change his suitability for a *Sell* order, which requires that the treatment plan be "substantially likely" to lead to his competency.

[7] A remand will also allow the district court to reconsider the *Sell* order in light of its potentially erroneous beliefs related to a study of BOP prisoners treated under *Sell* (the "Cochrane" study), on which it relied in entering the order. The district court noted in its order that five of the six prisoners in the study who were given multiple anti-psychotic drugs regained competence. In fact, the record evidence of the study - as agreed by both sides - does not reflect whether or not those prisoners were restored to competency.

Having determined that the district court should address Brown's changed circumstances as an initial matter, this Court must also decide whether to vacate the *Sell* order as requested by Brown or simply remand the case to the district court for further proceedings without vacating the order as preferred by the government. *Compare United States v. Osborn*, 921 F.3d 975 (10th Cir. 2019) (holding that courts generally should vacate a *Sell* order and begin anew when a defendant is forcibly medicated under *Harper* while a *Sell* order is being considered on appeal) *with United States v. Grape*, 549 F.3d 591 (3d Cir. 2008) (affirming a *Sell* order where defendant was forcibly medicated under *Harper* and attained competency while *Sell* order was on appeal). Because of the particular facts of this case the Court will remand this case to the district court without vacating the *Sell* order in the interests of judicial economy and need not now decide any broader rule for handling this issue in this circuit.[8]

As noted above, the additional medication given to Brown under *Harper* is the same medication that was to be added under the *Sell* order.[9] Thus, Brown's new circumstances

---

[8] Indeed, at oral argument Brown's counsel acknowledged that "I don't think there is a big functional difference" between remanding and vacating the *Sell* order and simply remanding the case to the district court to allow that court to consider Brown's changed circumstances without vacating the *Sell* order. *See* Oral Argument at 13:15, *United States v. Eric Brown*, No. 20-4017 (4th Cir. May 18, 2020), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

[9] The Parties dispute whether the district court appropriately specified the permissible olanzapine dosage range in its *Sell* order. *Compare United States v. Hernandez-Vasquez*, 513 F.3d 908, 916 (9th Cir. 2008), *with United States v. Breedlove*, 756 F.3d 1036, 1042–44 (7th Cir. 2014). We need not decide this issue today.

are highly relevant and likely to be instructive in a reconsideration of the *Sell* order on remand. Further, Dr. Graddy has only prescribed a daily injection of olanzapine for a period of two weeks beginning May 12, 2020. Although this prescription might be extended, the duration of the administration of olanzapine to Brown under the *Harper* order could be very short. In this situation, it is unnecessary and unwise as a matter of judicial economy to vacate the *Sell* order and require the district court and the parties to fully restart the *Sell* process from the beginning, regardless of how much new information is provided by the additional medication under *Harper*. Instead, a remand without vacating the order leaves the district court free to apply its considered judgment to tailor the reopening of the *Sell* process to take into account the specifics of the developing evidence. And, as with fact-finding, determining the scope and process for the consideration of changed circumstances is well within the traditional role of the district court.

Finally, Brown expresses a concern, also expressed in *Osborn*, 921 F.3d at 982, that the government may be attempting to "game" the system by using *Harper* proceedings to forcibly medicate him while retaining the *Sell* order to use once he can no longer be medicated under *Harper*. Beyond the fact that there is no suggestion, much less evidence, of any such impropriety here, the district court stayed its *Sell* order pending this appeal, and this Court will instruct the district court to maintain that stay on remand. Therefore, the government will be in no better position than it is now with respect to being able to put the *Sell* order into operation, including if there is the need for a future appeal. Also, in the event that the government is found to be engaging in improper gamesmanship, the district court is fully capable of vacating its own *Sell* order and requiring the government to

14

reinitiate the *Sell* process once the additional medication under *Harper* ends. Accordingly, this Court finds no need to vacate the *Sell* order in this case simply to discourage improper conduct by the government.

*     *     *     *

The forcible medication of a defendant for the purpose of making him competent to stand trial is a drastic step that must pass a demanding test that ensures, *inter alia*, that the medication is necessary, medically appropriate and substantially likely to render the defendant competent.  However, the Court does not today reach or express any view on the merits of the district court's *Sell* order. Instead, in light of the recent and significant change in Brown's medication under the district court's *Harper* order, the Court will remand the case to the district court to address that new information,  which is likely to provide highly relevant evidence concerning several disputed issues related to the *Sell* order, as an initial matter. Further, the Court instructs the district court to maintain the stay of its *Sell* order during its consideration of this new information and pending any future appeal of the *Sell* order, if it is continued upon remand.

*REMANDED WITH INSTRUCTIONS*