**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 28, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

STEVEN PAUL BRADLEY,

    Defendant-Appellant.

No. 03-8097

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 03-CR-102-D)**[*]

David A. Kubichek, Assistant United States Attorney, (Matthew H. Mead, United States Attorney, with him on the brief), Casper, Wyoming, for Plaintiff-Appellee.

Ronald G. Pretty, Cheyenne, Wyoming, for Defendant-Appellant.

Before **SEYMOUR, LUCERO** and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* FED. R. APP. P. 34(a)(2); 10th Cir. R. 34.1.9(G). The case is therefore ordered submitted without oral argument.

Steven Paul Bradley (Bradley) was found incompetent to stand trial. Physicians at a government medical facility, however, concluded Bradley's competency to stand trial could be restored through treatment with anti-psychotic drugs. After Bradley's repeated refusal to take such medication, the district court, pursuant to the standards set forth in *Sell v. United States*, 539 U.S. 166 (2003), ordered Bradley to be involuntarily medicated in order to render him competent to stand trial. Bradley appeals this order. Exercising jurisdiction under the collateral order exception[1] to the final order rule of 28 U.S.C. § 1291, we affirm.

## I. Background

On January 31, 2003, Bradley was charged by criminal complaint with violating 18 U.S.C. § 844(i).[2] The complaint alleged that on the previous day, while riding a motorcycle, Bradley lobbed a hand grenade at a group of salesmen gathered in the

---

[1] "[A] preliminary or interim decision is appealable as a collateral order when it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Sell,* 539 U.S. at 176 (internal quotation marks and citation omitted). An order to involuntarily medicate falls within the collateral order exception. *Id.*

[2] "Whoever maliciously . . . attempts to damage or destroy, by means of fire or an explosive, any building . . . used in interstate . . . commerce or in any activity affecting interstate . . . commerce shall be imprisoned for not less than 5 years and not more than 20 years . . . ." 18 U.S.C. § 844(i).

parking lot of Cowboy Dodge, a vehicle dealership in Cheyenne, Wyoming, because he

was dissatisfied with the purchase of a truck from the dealership. Attached to the grenade

was a note which read "I want my $26,000.00." In an interview with law enforcement,

Bradley admitted to the incident and also indicated he possessed explosives, explosive

devices and a firearm at his home because he believed someone was trying to kill him.

Bradley was subsequently indicted for violating 18 U.S.C. § 922(g)(1).[3] Later still, he

was charged by criminal complaint with violating 18 U.S.C. §§ 1951(a)[4] and

924(c)(1)(B)(ii).[5]

On February 5, Bradley moved *inter alia* for a determination of competency to

stand trial. On February 19, the court granted the motion. *See* 18 U.S.C. § 4241(a). It

ordered Bradley committed for a psychiatric or psychological examination, with report of

the results to be submitted to the court. *See* 18 U.S.C. § 4241(b). *See also* 18 U.S.C. §

_____

[3] "It shall be unlawful for any person— (1) who has been convicted in any court of, [sic] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any . . . ammunition . . . ." 18 U.S.C. § 922(g)(1). The penalty includes imprisonment for not more than ten years. 18 U.S.C. § 924(a)(2). Bradley had a prior federal conviction for possession with intent to distribute cocaine.

[4] "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts . . . so to do . . . shall be . . . imprisoned not more than twenty years . . . ." 18 U.S.C. § 1951(a).

[5] "[A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm [destructive device] . . . shall be sentenced to a term of imprisonment of not less than 30 years." 18 U.S.C. § 924(c)(1)(A), (B)(ii).

3

4247(C) (stating requirements for report). On June 19, with the report in hand, the court conducted a competency hearing. The report, authored by Dr. Richard L. DeMier, Ph.D.,[6] diagnosed Bradley with a psychotic mental illness (paranoid schizophrenia), averred he was not a danger to himself or others within the facility, concluded he lacked competency to proceed to trial,[7] and stated Bradley's prognosis was fair:

> [Bradley] has no appreciable insight into the nature or ramifications of [his] disorder, and he may be resistant to treatment. Nevertheless, psychiatric medications are generally able to effectively treat symptoms such as those displayed by the defendant. It is possible that an extended period of mental health treatment in an inpatient setting would be sufficient to restore his competency. He might well exhibit a therapeutic response to a regimen of psychiatric medications during such a period of hospitalization. Although a positive treatment response cannot be guaranteed, it is a reasonable expectation that Mr. Bradley could be restored to competency following a period of treatment in a structured setting, which included a regimen of psychiatric medications . . . .

(Appellee App. at 30.) On June 19, the court, on the basis of the report, found Bradley lacked competency to proceed to trial. It ordered him recommitted for treatment and further evaluation to ascertain the likelihood he would regain competence within the foreseeable future. *See* 18 U.S.C. § 4241(d).

Three days before the competency hearing, the Supreme Court decided *Sell*, in

---

[6] Dr. DeMier is a clinical psychologist attached to the United States Medical Center for Federal Prisoners in Springfield, Missouri.

[7] "Although Mr. Bradley is able to demonstrate a sound understanding of legal processes in the abstract, his psychotic mental illness prevents him from applying that information to his own case in a rational manner." (Appellee App. at 29.)

4

which it held:

> the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

*Sell*, 539 U.S. at 179.  With this in mind, the court ordered that Bradley's further evaluation include an "assessment of the relevant factors" stated in *Sell* for the involuntary administration of antipsychotic medication to assist Bradley's return to competence.[8]  (*Id.* at 35.)

Pursuant to the court's instruction, Dr. DeMier conducted his follow-up assessment with the following questions in mind:

1. Would Mr. Bradley benefit from treatment with psychiatric medications?

2. Can Mr. Bradley be persuaded, in consultation with his clinicians, to voluntarily submit to treatment with psychiatric medications?

3. If Mr. Bradley is unwilling to voluntarily submit to treatment with psychiatric medications, would that treatment nevertheless be considered medically appropriate?

4. Would the administration of psychiatric medications have unfavorable side effects which would be substantially likely to undermine the

---

[8] The court reserved for itself the legal question whether or not involuntary administration of antipsychotic drugs to Bradley would "further important governmental trial-related interests." *Sell*, 539 U.S. at 179.  (Appellee App. at 16.)

5

fairness of any trial which might occur in this case?

> 5. Is treatment with psychiatric medication likely to return Mr. Bradley to a status in which he can substantially assist his attorney in his defense?

(*Id.* at 37.)

In his report, dated August 22, Dr. DeMier again diagnosed Bradley with a psychotic mental illness (paranoid schizophrenia), averred he was not a danger to himself or others within the facility, and concluded he was incompetent to proceed to trial. He answered the questions posed in the court's order as follows:

> 1. "The treatment of choice for a psychotic disorder is antipsychotic medication. Indeed, antipsychotic medication is essential to the effective treatment of psychotic disorders. . . . Other forms of treatment, including education, psychotherapy, and behavioral interventions, do not address the essence of the disorder and are unlikely to be successful."
>
> 2. Bradley was unwilling to voluntarily submit to treatment with psychiatric medications.
>
> 3. "Because treatment with psychiatric medications is the intervention of choice for Mr. Bradley's condition, it is my opinion, as well as the opinion of the psychiatry staff at this facility, that treatment of his illness with psychiatric medications is medically appropriate."
>
> 4. The most common side effects of antipsychotic medications are best characterized as nuisance side effects, as their appearance does not entail the risk of serious harm, but only inconvenience or discomfort . . . . More serious side effects are far less common . . . . The vast majority of patients report no serious side effects, and nuisance side effects can be effectively addressed. Some patients report no side effects whatsoever. Especially with the advent of a newer class of "atypical" antipsychotic medications, the appearance of severe side effects is becoming increasingly rare.
>
> The therapeutic effect [of] antipsychotic medication is to improve

6

thinking.  Individuals with psychotic disorders typically have severe impairment in both the form and content of their thoughts.  This may include disorganized thoughts, sensory distortions (such as hallucinations), disturbances of emotion, and impairments in the ability to think in a rational or sequential manner.  Treatment of these impairments is likely to enhance, rather than undermine, the fairness of any legal proceeding in which the patient is a participant.

5.  [I]t is a reasonable expectation, based on the current scientific knowledge in psychiatry and on experiences with many individuals with similar disorders, that Mr. Bradley could be restored to competency following a period of treatment in a structured setting, which included a regimen of psychiatric medications.

(*Id.* at 41-43.)

On November 3, the court conducted another competency hearing.  Dr. DeMier testified that Bradley's condition had not changed since the assessment contained in his August 22 report.  "The only additional information that's not in the report again has to do with Mr. Bradley's stance since the report was prepared in that he is becoming more and more insistent that he has no mental illness and has voiced strong opposition to taking medication."[9]  (Appellee App. at 58.)  The court again found Bradley incompetent to proceed to trial.  It adopted Dr. DeMier's findings, addressed each of the *Sell* factors and ordered Bradley to consult with counsel with an eye to voluntarily submitting to the medication.  If he did not voluntarily submit with ten days, the court indicated it would

---

[9] Bradley himself testified he would refuse to voluntarily take antipsychotic medications; it was his belief they were not medically indicated.

7

enter an order for involuntary administration of the medication.[10]  This it did on

November 13, 2003:

> ORDERED that Defendant, after further consultation with his attorney and
> the mental health professionals at the U.S. Medical Center for Federal
> Prisoners in Springfield, Missouri, shall submit to the administration of
> medication which the Court finds is medically appropriate and necessary to
> render Defendant competent to stand trial.  If Defendant refuses to comply
> with the Court's order, he will be found in civil contempt.

(Appellant App. at 107.)[11]  Bradley appeals.

---

[10] The district court stated:

> An appropriate order compelling [the] administration of this
> drug will issue from this Court within ten days from today.
>
> . . .
>
> The only order that will issue from this Court today, Mr.
> Bradley, is that you again consult with your lawyer privately
> regarding these issues and thereafter voluntarily submit to the
> administration of these drugs.  The Court orders you to do that and in
> doing so intends to exercise its full civil contempt powers.

(Appellant's App. at 98.)

The minute entry in the court's docket characterizes the November 3, 2003
order as follows: "Court finds defendant will benefit from antipsychotic
medication and orders if the defendant will not voluntarily take medication the
Court will find him in civil contempt and order the involuntary administration of
medication."  (Appellee's App. at 104.)

[11] The court's order is no less one for the involuntary administration of
antipsychotic medication because its means of enforcement is through the exercise
of the contempt power of the court rather than by forcible medication.  *See Sell*,
539 U.S. at 181 ("[T]he court must consider less intrusive means for
administering the drugs, e.g., a court order to the defendant backed by the
contempt power, before considering more intrusive methods.").  The hallmark of

## II. Standard of Proof & Standard of Review

The Supreme Court in *Sell* articulated neither a standard of proof for the *Sell* factors nor a standard of appellate review. In deciding these standards, we bear in mind that involuntary administration of antipsychotic medications implicates a constitutional right. "[A]n individual has a constitutionally protected liberty interest [under the Due Process Clause] in avoiding involuntary administration of antipsychotic drugs–an interest that only an essential or overriding state interest might overcome." *Sell*, 539 U.S. at 178-79 (internal quotation marks and citation omitted). The standards we set must weigh this vital constitutional interest in the balance.

To date, only one circuit has decided the standard of proof and the standard for appellate review of the *Sell* factors. The Second Circuit first parsed the *Sell* factors into factual and legal questions. It decided "[w]hether the Government's asserted interest is important is a legal question." *United States v. Gomes,* 387 F.3d 157, 160 (2d Cir. 2004), *cert. denied*, 125 S.Ct. 1094 (2005). We agree, with one qualification. We would expand the parameters of the legal question to include whether involuntary administration of antipsychotic drugs "is necessary significantly to further important governmental

_____

an order for the involuntary administration of medication is that it breaches the defendant's will. *See id.* at 171 ("The staff sought permission to administer the medication against Sell's will. That effort is the subject of the present proceedings.") (emphasis added). A defendant who is unwilling to voluntarily take medication, which fairly describes Bradley, is no less overcome by a threat to be found in contempt than he or she is by being forcibly medicated.

9

trial-related interests." *Sell,* 539 U.S. at 179. In other words, "[h]as the Government, in light of the efficacy, the side effects, the possible alternatives, and the medical appropriateness of a particular course of antipsychotic drug treatment, shown a need for that treatment sufficiently important to overcome the individual's protected interest in refusing it?" *Id.* at 183.[12] The Second Circuit determined the remaining *Sell* factors depend upon factual findings and ought to be proved by the government by clear and convincing evidence. *Gomes,* 387 F.3d at 160. Recognizing the vital constitutional liberty interest at stake, we agree. We review conclusions of law *de novo* and findings of fact for clear error. *Stillwater Nat'l Bank & Trust Co. v. CIT Group/Equipment Finan. Inc.,* 383 F.3d 1148, 1150 (10th Cir. 2004).

## *III. Discussion*

The question whether a district court has followed the correct procedures under *Sell* for involuntary administration of antipsychotic medication to a non-dangerous

---

[12] *See also United States v. Sell,* 282 F.3d 560, 568 (8th Cir. 2002) (citation omitted), *vacated by* 539 U.S. 166 (2003).

> The first question, therefore, is whether the district court erred by holding that the government's interest in bringing Sell to trial is sufficient to outweigh Sell's interest in refusing medication. This is a mixed question of law and fact, so we review the district court's finding de novo. To make this determination, we must weigh the government's interest in rendering Sell competent against Sell's interest in refusing unwanted medication.

criminal defendant for the purpose of rendering him competent to stand trial[13] is one of first impression in this circuit. We first observe the predicate for the *Sell* factors is clearly established by the record. There is no dispute Bradley is mentally ill. Nor is it contested he faces serious criminal charges (the three pending criminal charges against him permit imprisonment for a total of 50 years). We now take up the propriety of the court's order with respect to the *Sell* factors *ad seriatim*.

We turn first to the factual findings. *Sell* directs the court to determine whether or not administration of antipsychotic medication is medically appropriate, "*i.e.*, in the patient's best medical interest in light of his medical condition. The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Sell*, 539 U.S. at 181. This necessarily includes a determination that administration of the drug regimen is "substantially likely to render the defendant competent to stand trial." *Id.*

Dr. DeMier characterized administration of antipsychotic medication in general as "[t]he treatment of choice for a psychotic disorder" and superior to non-pharmaceutical

---

[13] In *Sell*, the Supreme Court stated that it was not necessary for a court to satisfy the standards for involuntary administration of antipsychotic drugs in order to render a defendant competent to stand trial if there was an independent and sufficient basis to otherwise order their administration, such as where the defendant is dangerous or where withholding of the drugs would endanger his or her health. *Sell,* 539 U.S. at 181-83. The record in this case provides no basis for an order for involuntary administration of antipsychotic drugs on the basis of dangerousness or threat to health.

interventions. (Appellee App. at 41.) He indicated that while some patients may suffer side effects from administration of antipsychotic medications, these are typically of the nuisance variety and able to be effectively treated. He added that "[u]se of the newer 'atypical' antipsychotic medications has largely eliminated the necessity to prescribe a second medication to alleviate side effects." (*Id.* at 42.) Also, with the newer drugs, "severe side effects [are] becoming increasingly rare." (*Id.*) He cautioned that "because individuals vary greatly in their therapeutic responses to psychiatric medications, and in their susceptibility to side effects, it is important to continue to monitor them regularly." (*Id.* at 43.) Most significant, in our view, was Dr. DeMier's observation that "[i]ndividuals with psychotic disorders typically have severe impairment in both the form and content of their thoughts[,]" and "[t]he therapeutic effect [of] antipsychotic medication is to improve thinking." (*Id.*) In his opinion,

> [a] course of inpatient mental health treatment which includes the administration of psychiatric medications is usually sufficient to restore a defendant to competency. It is the experience of the clinicians at this facility that more than 80% of defendants committed for competency restoration treatment are later deemed competent by the trier of fact.

(*Id.*) He was guardedly optimistic that administration of antipsychotic medication would materially aid in restoring Bradley to competency. Based on Dr. DeMier's report and testimony, the district court found that Bradley would

> substantially benefit from the administration of psychiatric medications . . . and that the therapeutic effect of these antipsychotic medications far outweigh any potential negative side effects to their administration and that, in any event, there are appropriate mechanisms available to monitor the defendant's

12

administration of these drugs to ensure that he does not suffer from some adverse consequence of these drugs.

(*Id.* at 83-84.)

The excerpted record admits of little challenge to the proposition that administration of antipsychotic drugs would substantially aid Bradley's return to competency. We conclude the Government met its burden of establishing by clear and convincing evidence that such a regimen was medically appropriate, and the district court did not clearly err in so finding.

Next, *Sell* directs an inquiry into whether "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* Dr. DeMier initially reported that while Bradley had a "sound understanding of legal processes in the abstract, his psychotic mental illness prevents him from applying that information to his own case in a rational manner." (Appellee App. at 29.) He later added that "[t]reatment of [his] impairments [with antipsychotic drugs] is likely to enhance, rather than undermine, the fairness of any legal proceeding in which the patient is a participant." (*Id.* at 43.) The court so found. The record is bereft of any challenge to this proposition. It is patent from the evidence. Therefore, the court did not clearly err in its finding.

Finally, "[t]he court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results. And the court must consider less intrusive means for administering the drugs, *e.g.*, a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.* at 181 (citations

13

omitted).  As earlier noted, Dr. DeMier reported that an antipsychotic drug regimen was the treatment of choice for psychosis and far superior to non-pharmaceutical interventions.  There is nothing in the record to rebut this proposition.  To the end, the court tried to induce Bradley to voluntarily consent to the drug therapy.  Even as it entered its order for involuntary administration of antipsychotic drugs, the court ordered Dr. DeMier and Bradley's counsel to separately confer with Bradley on the advantage of voluntarily submitting to treatment.

Furthermore, the court considered and ordered a less intrusive means of implementing its order for involuntary drug therapy.  If Bradley continued to refuse to take the drugs, the consequence was not that he would be forcibly medicated against his will, but that he would have to answer to the court for his refusal.  This is a measured and appropriate response by the district judge to the circumstances presented.  Therefore, we conclude the Government met its burden in establishing by clear and convincing evidence that less intrusive treatments were "unlikely to achieve substantially the same results," *id.*, as drug therapy, and the court did not err in so finding.

We now turn to the court's legal conclusions.  *Sell* first requires a legal determination whether "*important* governmental [trial-related] interests are at stake." *Id.* at 180.  The district court concluded in the affirmative.  *Sell* elaborates on this requirement.  It does so in the context of well-settled law that considers the Government's interest in bringing a criminal defendant to trial to be fundamental.  *See Illinois v. Allen*, 397 U.S. 337, 347 (1970) (Brennan, J., concurring) (The "[c]onstitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace.").  However, while "[t]he Government's interest in bringing to

14

trial an individual accused of a serious crime is important . . . [c]ourts must consider the facts of the individual case in evaluating the Government's interest in prosecution. Special circumstances may lessen the importance of that interest." *Sell*, 539 U.S. at 180.

The Court offered two examples of special circumstances. In the first, a defendant, in the absence of court-ordered administration of psychiatric medication, might suffer lengthy civil commitment for mental illness "that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* In the second, a defendant may have already been confined for a lengthy period of time pending a determination of competency, confinement for which he or she would receive credit against any sentence ultimately imposed. *Id.* As we read *Sell*, this latter example suggests that when the amount of time the defendant is confined pending determination of competency is in parity with an expected sentence in the criminal proceeding, the Government may no longer be able to claim an important interest in prosecution.

Neither example applies here. The federal civil commitment statute requires a showing that the proposed patient presents "a substantial risk of bodily injury to another person or serious damage to property of another[.]" 18 U.S.C. § 4246(a). The State of Wyoming, where Bradley is domiciled, requires proof of mental illness for civil commitment, WYO. STAT. ANN. § 25-10-110(j), with mental illness defined as "a physical, emotional, mental or behavioral disorder which causes a person to be dangerous to himself or others and which requires treatment[.]" WYO. STAT. ANN. § 25-10-101(a)(ix). Dr. DeMier reported Bradley presented no threat to himself or others within

15

the facility where he was held.[14]  He testified he did not evaluate for risk to persons or property outside of the facility.  In all, the record does not support the proposition that Bradley would be a candidate for civil commitment.[15]

Nor does the second example apply.  Less than nine months elapsed between Bradley's commitment for competency examination and the court's order for involuntary administration of antipsychotic drugs.  This span of time pales in comparison to the fifty years imprisonment Bradley faces if convicted of the charges against him.  Without an order for the involuntary administration of antipsychotic drugs, and with Bradley's continuing refusal  to voluntarily accept such drug therapy, the additional length of time Bradley could be held pending competency determination is limited.  *See* 18 U.S.C. § 4241(d).

---

[14] "His behavior has been cordial, cooperative, and he's exhibited no behaviors at this facility that have caused us any concern for our safety or the safety of other people around Mr. Bradley within this setting."  (Appellee App. at 57.)

[15] We hasten to add, as the District of Columbia Circuit has noted, that while civil commitment might reduce the danger to the community posed by an individual,

> [t]he civil commitment argument assumes that the government's essential penological interests lie only in incapacitating dangerous offenders. It ignores the retributive, deterrent, communicative, and investigative functions of the criminal justice system, which serve to ensure that offenders receive their just deserts, to make clear that offenses entail consequences, and to discover what happened through the public mechanism of trial.

*United States v. Weston,* 255 F.3d 873, 882 (D.C. Cir. 2001).

16

Apart from these failed examples, we can identify no other special circumstances tending to diminish the importance of the Government's interest in restoring Bradley to competence so that he may face trial. Therefore, we find no error in the court's legal conclusion that important Government interests are at stake in restoring Bradley to competency.

Finally, we reach the ultimate legal question whether involuntary administration of antipsychotic drugs "is necessary significantly to further," *Sell*, 539 U.S. at 179, the important governmental trial-related interests in returning Bradley to competency. Here, the court's factual findings come into play. Without any one of these findings, it is impossible to say that involuntary administration of antipsychotic drugs would further the Government's interest in restoring Bradley to competency. *See id.* at 181. However, with the court having not clearly erred in making any of its findings, we easily conclude its order for involuntary administration of antipsychotic drugs will significantly further important governmental trial-related interests. In other words, the need for treatment with antipsychotic drugs is "sufficiently important to overcome [Bradley's] protected interest in refusing it." *Id.* at 183.

### *IV. Conclusion*

Accordingly, we **AFFIRM** the order of the district court.