FILED
United States Court of Appeals
Tenth Circuit

June 10, 2019

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL JAMES SEATON,

    Defendant - Appellant.

No. 19-1093
(D.C. No. 1:18-CR-00027-RBJ-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **BACHARACH**, and **EID**, Circuit Judges.
_____

Michael Seaton appeals a district court order requiring that he be involuntarily medicated in an effort to restore him to competency to stand trial under <u>Sell v. United States</u>, 539 U.S. 166 (2003). Such orders are subject to our interlocutory review under the collateral order doctrine. <u>Id.</u> at 177. Seaton contends that because the length of his pretrial detention (which would be credited to any term of imprisonment) may be as long as his Guidelines range, the district court erroneously determined the government's interest in bringing him to trial is important. However, Seaton's calculations fail to consider the potential for a term of supervised release,

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

which we conclude is particularly important under the facts of this case and would likely extend well beyond the duration of pretrial confinement. Seaton also argues the district court clearly erred in ruling that anti-psychotic medication is substantially likely to restore him to competency. In light of the expert testimony provided on general success rates and factors particular to Seaton, we disagree. Accordingly, we affirm the district court's Sell order.

## I

Seaton is charged with one count of communicating a threat in interstate commerce in violation of 18 U.S.C. § 875(c) and one count of threatening to murder the family member of a U.S. official in violation of 18 U.S.C. § 115(a)(1)(A). The charges stem from a call he allegedly made to a U.S. Senator.

Seaton was arrested in January 2018. Shortly after being appointed, defense counsel moved for a competency evaluation. Forensic psychiatrist Dr. Susan Bograd conducted an in-person evaluation of Seaton that lasted approximately four and a half hours. She determined he had suffered from schizophrenia for approximately forty years, during which time he had not received mental health treatment. Dr. Bograd opined that Seaton was not competent to stand trial because he was unable to assist in his defense and did not understand the nature and consequences of the proceeding. She also stated: "it is my opinion with a reasonable degree of medical certainty that it is more likely than not that his psychiatric symptoms will be insufficiently alleviated to achieve restoration to competency" because "[a] great deal of long-lasting, well ingrained, complex and multilayered delusional thinking would have to

2

resolve for him to understand the nature and consequences of the proceedings and to assist properly in his defense." A second psychiatrist, Dr. Karen Fukutaki, also concluded Seaton was not competent to stand trial.

Following a hearing at which Seaton, Dr. Bograd, and Dr. Fukutaki testified, the district court found Seaton incompetent to proceed. It ordered him committed to custodial hospitalization under 18 U.S.C. § 4241(d) for up to four months to determine whether his condition was likely to improve. Seaton was transferred to a Bureau of Prisons ("BOP") medical facility in Springfield, Missouri.

BOP forensic psychologist Dr. Lea Ann Preston Baecht saw Seaton routinely during his stay and conducted numerous clinical interviews. She encouraged him to consent to anti-psychotic medication, but he refused. After several months at the facility, Dr. Preston Baecht opined that Seaton remained incompetent and was unlikely to be restored to competency absent the use of anti-psychotic medication. She further stated that "it is substantially likely that Mr. Seaton will be restored to competency" if he were administered anti-psychotic medication. She explained that she could not "guarantee" such an outcome but noted that "the available literature supports the conclusion that most individuals with psychotic symptoms can be successfully restored to competency." Dr. Robert Sarrazin, chief of psychiatry at the facility, prepared a treatment plan identifying specific medication and dosages.

Dr. Bograd conducted a second interview with Seaton. She agreed that Seaton remained incompetent to proceed. She also concluded that anti-psychotic medication was in "Seaton's best medical interest because of his mental health condition."

3

However, Dr. Bograd concluded "that medication is not substantially likely to render . . . Seaton competent" because "[h]is delusional belief system is longstanding and complex."

The government then moved for a Sell hearing and an order for involuntary medication of Seaton. Seaton opposed the motion. The district court held an evidentiary hearing at which Dr. Bograd, Dr. Preston Baecht, and Dr. Sarrazin testified.

Dr. Preston Baecht testified that she met with Seaton at least once per week over four months, and spent many hours with him. During her twenty-year BOP career, she had seen approximately fifty to seventy patients per year, the majority of whom were evaluated for restoration of competency. Based on that experience and on competency-restoration literature, Dr. Preston Baecht concluded that medication was substantially likely to render Seaton competent. She explained that the literature indicated approximately 75 to ninety percent of patients treated with anti-psychotic medication are restored to competency.

She discussed several factors that influence individual defendants' prognoses. A co-occurring cognitive disorder, such as dementia, or a prior history of failed treatments make it less likely that medication will be successful. Seaton did not present either factor. She also noted that Seaton's "particular case" was not factually complex. Dr. Preston Baecht conceded some of Seaton's characteristics had been found to correlate with less favorable prognoses, including poor adjustment prior to his primary diagnosis of schizophrenia and being male. However, she stated that

4

Seaton was not atypical in terms of the degree to which his delusions are entrenched or the extent of his impairment.

Although she acknowledged that the length of untreated psychosis correlates with poor outcomes, Dr. Preston Baecht noted most of that research does not focus on competency restoration. And she stated that data on competency restoration typically does not "parse out duration of untreated psychosis." But in her "personal experience," she had observed improvement in "patients that have gone many, many years without being treated." Dr. Preston Baecht further stated that she has had "a lot of patients that go a very long time without receiving treatment, and they still respond well to medicine." She identified one patient who had been psychotic for approximately forty years, with one brief period of medical restoration fifteen years prior, whose symptoms had completely remitted. She concluded:

> although I think it is reasonable to be concerned that [Seaton] may not
> respond as well as if he had received treatment as soon as his symptoms
> emerged, I don't think that it's enough for me to say it's a barrier that he
> will not be restored, because in my experience, even with long periods
> of untreated psychosis, I still see [patients] benefiting from treatment.

Dr. Sarrazin also testified that medication was substantially likely to restore Seaton to competency. Based on his seventeen years of experience at the BOP facility, Dr. Sarrazin stated that approximately 75 percent of patients treated with anti-psychotic medication are restored to competency. He also identified several factors that influence the likelihood an individual will respond favorably, including past response to anti-psychotic medication, age, and a significant intellectual disability. He conceded that the duration of untreated psychosis is a factor. But he

5

explained that some of the literature to that effect focused on individuals who had either a separate cognitive issue or had been hospitalized for lengthy periods. Because Seaton had been functioning in society for the duration of his illness, Dr. Sarrazin suggested his issues were likely less severe than those who failed to respond to treatment.

Dr. Bograd testified that anti-psychotic medication was not substantially likely to restore Seaton to competency. She stated that medication would likely provide some benefit, but the length of time Seaton had been suffering untreated and the fact that Seaton's delusions were deeply ingrained made it less likely medication would restore him to competency. Dr. Bograd testified that she was not necessarily comparing the degree of Seaton's delusional belief system with other schizophrenic patients, but that Seaton was an "exception in [her] broader experience." She admitted, however, that Seaton had been able to live independently throughout his adult life despite his illness.

At the close of the hearing the district court stated it was "probably" going to rule in favor of Seaton. However, Seaton indicated he would be willing to take medication. The government withdrew its Sell motion. Shortly after the hearing, however, defense counsel informed the court and the government that Seaton again refused medication. The government then renewed its Sell motion.

The district court convened a second hearing but did not hear any additional evidence. It concluded the government had carried its burden of establishing the Sell factors by clear and convincing evidence. As to whether medication was

6

substantially likely to restore Seaton to competency, the district court summarized the testimony of the three witnesses. In discussing that testimony, the district court stated it had "no way of knowing" whether the medication would work, and "the only way that we can really find out if they will render him competent is to try it." The court further stated "that these medications are very likely to help Mr. Seaton, and there is at least a decent possibility, maybe probability, that they would either render him competent or answer the question." Defense counsel objected that the standard is substantial probability. The court then stated it had misspoken, and after again discussing the expert testimony found "that the evidence establishes that the medications are substantially likely to render the defendant competent and substantially unlikely to have side effects that will interfere with his ability to assist his counsel by a vote of two to one."

The district court entered a written order granting the government's Sell motion. It permitted the government to pursue a specified treatment plan for a period of up to four months. Seaton filed a notice of appeal. The district court then stayed its order pending appeal.

## II

"The forcible injection of medication into a nonconsenting person's body . . . represents a substantial interference with that person's liberty." Riggins v. Nevada, 504 U.S. 127, 134 (1992) (quotation omitted). "[I]nstances of involuntary medication of a non-dangerous defendant solely to render him competent to stand

7

trial should be rare and occur only in limited circumstances." United States v. Valenzuela-Puentes, 479 F.3d 1220, 1223 (10th Cir. 2007) (quotation omitted).

To obtain an order for the involuntary medication of a pretrial detainee for the purpose of restoring him to competency, the government must show:

> (1) "important governmental interests are at stake"; (2) the "involuntary medication will significantly further" those interests; (3) the "involuntary medication is necessary to further those interests," e.g., less intrusive alternative treatments are unlikely to be effective; and (4) the administration of the medication is "medically appropriate" and in the defendant's best medical interests.

United States v. Chavez, 734 F.3d 1247, 1249 (10th Cir. 2013) (quoting Sell, 539 U.S. at 180-81 (emphases omitted)). The first two prongs "are primarily legal questions that we review de novo." Id. at 1250. Any underlying factual findings, which the district court must find by clear and convincing evidence, are reviewed for clear error. Id. Clear and convincing evidence is that which "places in the ultimate factfinder an abiding conviction that the truth of its factual contentions are highly probable." Valenzuela-Puentes, 479 F.3d at 1228 (quotation and alteration omitted). The first two prongs of the Sell test are at issue in this appeal.

**A**

In general, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." Sell, 539 U.S. at 180. "Whether a crime is 'serious' relates to the possible penalty the defendant faces if convicted, as well as the nature or effect of the underlying conduct for which he was charged." Valenzuela-Puentes, 479 F.3d at 1226. In Valenzuela-Puentes, we concluded a crime

8

with a statutory maximum of twenty years was "serious," and cited with approval a Fourth Circuit case holding that a crime with a statutory maximum of ten years also so qualified. Id. (citing United States v. Evans, 404 F.3d 227, 232 (4th Cir. 2005)). The statutory maximum under § 875(c) is five years, and the maximum under § 115 is ten years. We also agree with the district court that the threatening conduct at issue was of considerable gravity. See Evans, 404 F.3d at 232 (holding that threats made to a federal judge charged under § 115 are sufficiently serious).

Although the government's interest in charging Seaton is important, "[s]pecial circumstances may lessen the importance of that interest." Valenzuela-Puentes, 479 F.3d at 1227 (quotation omitted). For example, a defendant may have "already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed)." Id. (quotation omitted). Accordingly, "when the amount of time the defendant is confined pending determination of competency is in parity with an expected sentence in the criminal proceeding, the Government may no longer be able to claim an important interest in prosecution." Id. (quotation omitted); see also United States v. Bradley, 417 F.3d 1107, 1117 (10th Cir. 2005) (considering the time that "elapsed between [defendant]'s commitment for competency examination and the court's order for involuntary administration of antipsychotic drugs"). In determining the expected sentence, we have looked to the statutory maximum and the likely Guidelines range. See Valenzuela-Puentes, 479 F.3d at 1226 (noting defendant "faces a statutory maximum prison term of twenty years,

9

although if he pleads guilty he will likely be sentenced within the guideline range to a term of 77 to 96 months").[1]

As noted above, Seaton's statutory maximum sentences are five and ten years. § 875(c); § 115. The parties provide a number of potential Guidelines ranges. It appears Seaton's criminal history category is I and the base offense level for both charges is twelve.[2] See U.S.S.G. § 2A6.1(a)(1). It is not clear whether his two offenses would be grouped under U.S.S.G. § 3D1.2. If they do not group, he could be subject to an increased offense level. See U.S.S.G. § 3D1.4. Seaton might face a two-level enhancement if the offense involved more than two threats, U.S.S.G. § 2A6.1(b)(2)(A), and a four-level enhancement if the threat resulted in a substantial expenditure of resources, U.S.S.G. § 2A6.1(b)(4)(B). Seaton could also obtain a two-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. If each of these issues were decided in Seaton's favor, his Guidelines range could be as low as six to twelve months. If each of these issues were decided in the government's favor, his

---

[1] Seaton argues that the district court failed to consider this special circumstance. However, during the first hearing, the district court discussed the matter. At one point, the court stated that Seaton's "sentence might be eaten up already by the time he's served, right? That's what you're trying to convince me in your document." It also noted that Seaton could be in pretrial custody for "around 30 months." In making its ruling on the first prong, the court stated that it had "considered defendant's position." We thus reject Seaton's contention that the district court failed to assess whether his pretrial detention diminished the government's interest.

[2] The foregoing discussion of Seaton's potential Guidelines calculations are based on the parties' submissions. We of course cannot definitively calculate his Guidelines range at this stage of the proceeding.

10

range could be as high as thirty to 37 months.  The government also notes that Seaton faces a term of supervised release following any sentence of imprisonment.  Under U.S.S.G. § 5D1.2(a)(1), he would likely receive one to three years of supervised release.  The district court referenced supervised release several times during the hearing.

At the time of the district court's decision, Seaton had been in custody for fourteen months.  Restoration to competency through the use of anti-psychotic medication generally takes four to eight months.  Additional time would be required for pretrial motions, potentially a trial, and sentencing to be completed.  Seaton also notes good-time credits are available at a rate of 54 days per year.  18 U.S.C. § 3624(b).

Considering all of these factors, we conclude that "the amount of time [Seaton] is confined pending determination of competency" is not "in parity with an expected sentence."  Valenzuela-Puentes, 479 F.3d at 1227 (quotation omitted).  We acknowledge the possibility that Seaton's Guidelines calculations could result in one of the lower ranges he identifies.  Nevertheless, a lengthy term of pretrial detention in relation to the expected sentence "affects, but does not totally undermine, the strength of the need for prosecution."  Sell, 539 U.S. at 180.

Even if the length of Seaton's pretrial detention were to fall near his Guidelines range for imprisonment, he likely would face a term of supervised release. We are particularly persuaded that the government maintains an interest in supervised release in Seaton's specific case should he be convicted.  In United States v. Onuoha,

11

820 F.3d 1049 (9th Cir. 2016), a defendant charged with making threats had been in custody for longer than his minimum Guidelines range sentence, but the court explained that "a sentence might also include a period of supervised release, which would help ensure that [the defendant] does not return to making threats when released into the public." Id. at 1056 (quotation omitted). Other courts have made similar observations. See United States v. Mackey, 717 F.3d 569, 575 (8th Cir. 2013) (noting that a term of supervised release, a "sanction—not available in a civil commitment proceeding—furthers the government's interest"); United States v. Gutierrez, 704 F.3d 442, 451 (5th Cir. 2013) (noting that a "conviction would authorize the district court to impose a term of supervised release, which would facilitate monitoring of [the defendant] to ensure that he does not pose a threat to others"); United States v. White, 620 F.3d 401, 413 (4th Cir. 2010) (identifying the fact that "if a conviction were obtained, the district court would have the option of imposing a period of supervised release as a factor bolstering the government's interest").

We accordingly affirm the district court's ruling that the government has established "important governmental interests are at stake." Chavez, 734 F.3d at 1249 (quotation and emphasis omitted).

**B**

Seaton also argues the district court should be reversed on the second prong of the Sell test, whether involuntary medication will "significantly further" the government's interest. 539 U.S. at 180. To satisfy this prong, the government must

12

prove "that administration of the drugs is substantially likely to render the defendant competent to stand trial." Id. at 181.[3] It must do so by clear and convincing evidence. Valenzuela-Puentes, 479 F.3d at 1224.

Seaton advances two separate arguments. First, he contends the district court applied an incorrect standard. He relies on the district court's initial statements that there was "a decent possibility, maybe probability" that Seaton would be restored to competency and that the only way to be certain "is to try it." We agree with Seaton that these comments reflect an incorrect standard. But the district court explained that it had misstated its conclusions, and expressly entered the finding "that the medications are substantially likely to render the defendant competent."[4] Seaton also points to the court's statement that he was likely to become competent "by a vote of two to one," explaining that a court cannot "base its decision on a mechanical nose count of witnesses." Sahara Coal Co. v. Fitts, 39 F.3d 781, 782-83 (7th Cir. 1994). We read the district court's statement as merely a summary of the witnesses' testimony rather than a rationale for its decision.

---

[3] The government is also required to prove "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Id. But that portion of the test is not in dispute.

[4] Our dissenting colleague cites Chavez for the proposition that the district court's finding was insufficient. (Dissenting Op. 1-2 n.1.) In that case, we considered a Sell order that lacked "any details regarding what drugs could be administered to [the defendant] or at what doses." Id. at 1252. The "high level of detail," id. we referred to relates to the requirement that Sell orders "specify which medications might be administered and their maximum dosages," id. at 1253.

13

Second, Seaton argues the district court clearly erred in finding the government carried its burden. We are not persuaded. Dr. Preston Baecht testified that approximately 75 to ninety percent of patients who are medicated are restored to competency. Dr. Sarrazin similarly stated that the success rate is approximately 75 percent. Of course, as one of our sibling circuits has observed, the government cannot merely show that a proposed treatment is "generally effective" but instead must prove that a proposed treatment plan, "as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial." United States v. Watson, 793 F.3d 416, 424 (4th Cir. 2015) (quotations and emphasis omitted). That burden "requires consideration of factors specific to the defendant in question." Id.

In addition to relying on statistical information from the literature and their general experience with patients, the government's witnesses identified numerous individualized factors suggestive of a positive outcome in Seaton's particular case. As the district court explained, "[t]hey cited the statistics, yes, over and over, but they also—both of them said that they assessed him on his own, and felt that based on their assessment he likely would fit into the statistical categories." Drs. Preston Baecht and Sarrazin testified that the following individual factors indicated that Seaton was likely to be restored to competence: (1) Seaton did not suffer from a co-occurring cognitive disorder; (2) he did not have a prior history of failed treatments; (3) his court case is not factually complex; and (4) Seaton had been functioning in society despite his lack of treatment.

14

Dr. Bograd disagreed with this assessment based on two inter-related factors indicating a poorer prognosis: the duration and depth of Seaton's delusions. The government's witnesses both acknowledged these factors lessen the likelihood of successful treatment. But they persuasively rebutted Dr. Bograd's overall conclusion.

Dr. Preston Baecht stated that most of the research regarding duration of untreated illness does not look at competency restoration. She explained that the standards for competency and general clinical success differed because "[i]t is not necessary for all symptoms to remit completely in order for someone to be considered competent." Relying on her personal experience,[5] Dr. Preston Baecht testified that she observed "many patients over the years that were treated, their delusions reduced in intensity but did not go away, and were ultimately found to be competent because they were able to work with their attorney for the resolution of their case without allowing those delusional beliefs to impact their decision-making." She stated that many of her patients had lengthy histories of untreated delusions but nevertheless responded favorably, specifically discussing one such patient with a history similar to Seaton's. Dr. Preston Baecht, who spent the most time with Seaton

---

[5] Dr. Preston Baecht has conducted hundreds of evaluations for restoration to competency. Although the dissent focuses on a few of the particular patients she discussed at the hearing, Dr. Preston Baecht was clear she was using those individuals as examples from her more extensive experience.

of the witnesses,[6] also testified that Seaton did not have unusually entrenched delusions or an unusually severe impairment.

Dr. Sarrazin also noted certain confounding factors as to duration of illness. He challenged one particular study about the duration of untreated illness, stating that unrestorable patients with a lengthy history in that study also had "severe mental illness." Although he admitted that Seaton has a "significant delusion system," Dr. Sarrazin testified that because Seaton had been functioning in the community, "been able to live with others, live independently, and hasn't been involuntarily hospitalized," his illness "may not be as severe as some other individuals, because he hasn't come to the attention of authorities."

The government in this case was required to prove all necessary facts by clear and convincing evidence—a high bar. Valenzuela-Puentes, 479 F.3d at 1224. But in reviewing the district court's factual finding that Seaton is substantially likely to regain competency through the proposed treatment plan, our review is for clear error. Chavez, 734 F.3d at 1249. A finding is clearly erroneous if "the reviewing court, on review of the entire record, is left with the definite and firm conviction that a mistake has been committed." United States v. Gilgert, 314 F.3d 506, 515 (10th Cir. 2002) (quotation and alteration omitted). Under this standard, "our role is not to re-weigh the evidence; rather, our review of the district court's finding is significantly

---

[6] The dissent claims that much of Dr. Preston Baecht's time with Seaton did not result in meaningful insight into his condition. (Dissenting Op. 8.) However, she merely stated that she found it unproductive to spend a significant amount of time having Seaton repeat the issues on which he was fixated.

deferential." <u>Id.</u> at 515-16 (quotation omitted). Having reviewed the entire record, we cannot say the district court clearly erred in finding a substantial likelihood that Seaton will be restored to competency.

**III**

**AFFIRMED**.

Entered for the Court

Carlos F. Lucero
Circuit Judge

*United States v. Seaton*, No. 19-1093

**BACHARACH**, J., dissenting.

I agree with the majority that the government established the first of the *Sell* elements: Mr. Seaton is charged with a serious crime, and important governmental interests are at stake. Maj. Order & Judgment at 8–12. The majority also concludes that the government met its burden under *Sell*'s second element. I disagree with this conclusion, so I respectfully dissent.

## 1. Introduction

On the second element of *Sell*, the district court concluded that the government had shown by clear and convincing evidence that the forced administration of psychotropic drugs was substantially likely to restore Mr. Seaton to competency. The court first acknowledged uncertainty about the likelihood of restoring Mr. Seaton's competency through involuntary medication, commenting that the three doctors could provide only educated guesses about that issue. When reminded of the government's strenuous burden, the court revised its explanation, stating that it had found restoration to competency substantially likely by a vote of two to one (because two expert witnesses testified that involuntary medication would likely be effective and only one expert testified to the contrary).[1]

---

[1]     The majority downplays this comment, stating that the district court's reference to the number of expert witnesses served only as "a

In my view, the district court clearly erred in finding that the government had shown by clear and convincing evidence that involuntary medication was substantially likely to restore Mr. Seaton to competency. I would thus vacate the district court's order and remand with instructions to deny the government's *Sell* motion.

## 2. *Sell* orders

The government bears a strenuous evidentiary burden because involuntary medication substantially interferes with the defendant's liberty. *See Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."). Given the interference with the defendant's liberty, the government must justify involuntary medication with clear and convincing evidence on each of the four *Sell* elements. *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 1995).

---

summary of the witnesses' testimony rather than a rationale for its decision." Maj. Order & Judgment at 13. I question this interpretation. In stating that the vote was "two to one," the court did not refer to the content of any of the testimony. Appellant's Opening Br., attach. A, at 6. But if the majority's interpretation is correct, the district court supplied *no* reason for finding that the government had satisfied its burden on *Sell*'s second element. The absence of any explanation would require us to reverse because *Sell* requires at least *some* explanation for the findings on the second element. *See United States v. Chavez*, 734 F.3d 1247, 1252 (10th Cir. 2013) (stating that *Sell* "plainly contemplate[s]" "comprehensive findings" and "a high level of detail").

Evidence is clear and convincing only when it triggers an "abiding conviction" in the correctness of the government's position, "instantly tilt[ing] the evidentiary scales" when weighed against the defendant's contrary evidence. *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). The rigor of this burden reflects the Supreme Court's consideration of the relative risks when psychotropic medication is forced on defendants to restore competency. *See Addington v. Texas*, 441 U.S. 418, 427 (1979) ("The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.").

Applying the Supreme Court's treatment of the relative risks, the district court must consider the evidence in light of the intensity of the risk to Mr. Seaton. The government bears a particularly heavy burden because the risk of injury to defendants, like Mr. Seaton, dwarfs the risk to society at large. *Id.* If the psychotropic drugs are substantially likely to restore Mr. Seaton to competency, the parties would both benefit substantially. (The government would be able to prosecute the criminal case, and Mr. Seaton's mental health would improve.) But if the court allows involuntary medication without the required proof, not only would the government remain unable to try Mr. Seaton but he would also lose freedom over his own thought processes. Thus, the district court must reserve *Sell* orders to

3

"rare" and "limited" circumstances and require the government to establish the necessary facts by clear and convincing evidence. *Sell v. United States*, 539 U.S. 166, 169 (2003).

The majority acknowledges that the government must show that the proposed treatment plan, "as applied to this particular defendant, is substantially likely to render the defendant competent to stand trial." Maj. Order & Judgment at 14 (quoting *United States v. Watson*, 793 F.3d 416, 424 (4th Cir. 2015)). As a result, the government's evidence must go beyond generalities, focusing on the particular defendant's mental condition, including the intensity and duration of his or her delusions. *See United States v. Evans*, 404 F.3d 227, 242 (4th Cir. 2005).

**3.    The evidence presented to the district court**

To support its request for a *Sell* order, the government presented testimony from two psychiatrists: Dr. Lea Ann Preston Baecht and Dr. Robert Sarrazin. In reaching their conclusions regarding the effectiveness of involuntarily medicating Mr. Seaton, Dr. Preston Baecht and Dr. Sarrazin relied on generalized evidence, focusing on statistics reflecting the effectiveness of involuntary medication in restoring competency to defendants with a broad swath of psychotic disorders. For example, Dr. Preston Baecht testified that roughly 75–90% of individuals with psychotic disorders are restored to competency when treated with antipsychotic medication.

4

Mr. Seaton countered with psychiatric testimony focusing on his own particular circumstances: roughly 40 years of intense delusions without any treatment whatsoever. His expert witness, Dr. Susan Bograd, first examined Mr. Seaton for over four hours. After this examination, Dr. Bograd focused on Mr. Seaton's deeply entrenched delusions, concluding that they were probably too intense and durable to permit restoration of competency through forced medication:

> Wherein I see a real problem in this case is the issue of restoration to competency. [Mr.] Seaton has been quite mentally ill for approximately 40 years. He has not received mental health treatment for approximately 40 years. His long-standing delusional belief system is well ingrained, complex, and multilayered. His life has revolved around his delusional belief system.
>
> . . .
>
> In the event that he were to receive antipsychotic medication, whether voluntarily or not, it is my opinion with a reasonable degree of medical certainty that it is more likely than not that his psychiatric symptoms will be insufficiently alleviated to achieve restoration to competency. A great deal of long-lasting, well ingrained, complex and multilayered delusional thinking would have to resolve for him to understand the nature and consequences of the proceedings and to assist properly in his defense.

R., vol. II, at 40.

After a follow-up examination that lasted roughly two hours, Dr. Bograd reaffirmed her earlier conclusion:

> It is my opinion with a reasonable degree of medical certainty that with appropriate medication there is not a substantial likelihood that his understanding of the charges against him

would cease to be distorted, that he would be able to rationally understand the roles of the various officers of the court[,] that he would be able to rationally understand legal advice and concepts provided him by his attorney and that he would be able to provide his attorney rational information sufficient to prepare for trial.

*Id.* at 64. Dr. Bograd added that forced medication would only deepen Mr. Seaton's delusions: "It is also my opinion with reasonable degree of medical certainty that [Mr.] Seaton would experience forced medication as abusive and that it would feed into his delusional belief system." *Id.*

The majority acknowledges Dr. Bograd's opinions but concludes that they had been effectively rebutted by the government's two expert witnesses. But at oral argument, the government acknowledged that its expert witnesses had not addressed Dr. Bograd's testimony, explaining that the two government witnesses had simply arrived at a different conclusion.

The government was right: Its expert witnesses hadn't addressed Dr. Bograd's testimony. Both government witnesses reviewed Dr. Bograd's report prior to testifying. But Dr. Sarrazin never discussed Dr. Bograd's analysis or her conclusions. Unlike Dr. Sarrazin, Dr. Preston Baecht did refer to Dr. Bograd, but only to express agreement with her diagnosis of Mr. Seaton.

Rather than address Dr. Bograd's particularized focus on the intensity and duration of Mr. Seaton's delusions, Dr. Sarrazin and Dr. Preston Baecht relied on generalized statistical evidence about the

6

effectiveness of involuntary medication. This generalized evidence did not satisfy the government's rigorous burden in the absence of a reason to discount Dr. Bograd's opinion testimony focusing on Mr. Seaton's delusions over roughly 40 years. *See United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228–29 (10th Cir. 2007) (stating that we could not affirm the district court's factual findings when a physician had testified that the defendant's delusions were too "deeply ingrained" to disappear with psychotropic medication).

The majority concludes that the district court could reasonably credit the government's expert witnesses over Mr. Seaton's witness because (1) one of them (Dr. Preston Baecht) had spent more time with Mr. Seaton, (2) one of Dr. Preston Baecht's patients had been restored to competency despite a history resembling Mr. Seaton's, and (3) both of the government witnesses explained why they believed that Mr. Seaton's delusions were treatable with medication.

I respectfully disagree with the majority analysis for four reasons:

1. The district court did not rely on these factors when granting the government's request for a *Sell* order.

2. Dr. Preston Baecht acknowledged that much of her time with Mr. Seaton was useless.

3. Dr. Preston Baecht's limited experience with three other patients does not supply meaningful guidance on how Mr. Seaton would react to involuntary medication after experiencing intense delusions for approximately 40 years.

7

4.      The government's two expert witnesses did not supply any reason to question the severity of Mr. Seaton's delusions.

First, the majority's explanations are post-hoc. The district court did not suggest that it was crediting the government's evidence for the reasons now offered by the majority. The court instead relied solely on the fact that the government had presented two expert witnesses and Mr. Seaton had presented only one.

Second, the amount of time that Dr. Preston Baecht had spent with Mr. Seaton could not supply meaningful guidance on the second *Sell* element. Dr. Preston Baecht did testify that she had met with Mr. Seaton over a period of about four months. But she didn't suggest meaningful insight from this time with Mr. Seaton. Indeed, she said the opposite, admitting that much of the time was unhelpful: "[Mr. Seaton] perseverated on the same issues, and so what I found was it wasn't really productive to spend a significant amount of time going over that material." R., vol. III, at 17.

Third, Dr. Preston Baecht did not say, or even suggest, that she had a suitable universe of comparable patients to meaningfully guide her assessment of Mr. Seaton. She mentioned three patients. Two showed improvement after experiencing delusions for about ten years, and Dr. Preston Baecht did not say that their medication had been involuntary. A third patient had experienced psychoses for roughly 40 years. After about

8

25 years, he improved with psychotropic medication. He then stopped taking the medication for over a decade, but his symptoms remitted after he started taking the medication again.[2]

Dr. Preston Baecht's experience with these three patients did not provide a sufficient basis to predict the effectiveness of involuntary medication on Mr. Seaton. Indeed, Dr. Preston Baecht acknowledged that she had never treated anyone who, like Mr. Seaton, "has gone 40 years without treatment." R. vol. III, at 54. And she acknowledged that no one knows how Mr. Seaton would respond to medication because he "may have been ill for a very, very long time without treatment." *Id.* at 25; *see* Christopher Slobogin, Sell*'s Conundrums: The Right of Incompetent Defendants to Refuse Anti-Psychotic Medication*, 89 Wash. U.L. Rev. 1523, 1530 n.43 (2012) ("The longer the duration between the onset of serious psychosis and treatment, the more likely long-term disability will result."). Given this uncertainty about how Mr. Seaton would respond to treatment, Dr. Preston Baecht could only guess about the applicability of her general

---

[2] The majority notes that Dr. Preston Baecht has conducted hundreds of evaluations for restoration of competency. Maj. Order & Judgment, at 15 n.5. But the government hasn't suggested that those hundreds of evaluation are pertinent. At oral argument, the Court asked the government what evidence existed to show that psychotropic medication would likely help restore competency for someone, like Mr. Seaton, who had gone roughly 40 years without any treatment. In response, the government relied solely on Dr. Preston Baecht's testimony about her experience in treating these three individuals.

statistics. *See* Dora W. Klein, *Curiouser & Curiouser: Involuntary Medications & Incompetent Criminal Defendants After* Sell v. United States, 13 Wm. & Mary Bill of Rts. J. 897, 911 (2005) ("In most cases, . . . unless a defendant has taken psychotropic medications in the past, a court will be unable to do more than offer a best guess as to which—if any—medications will render a defendant competent to stand trial.").

Fourth, the government's two expert witnesses provided no meaningful reason to question the severity of Mr. Seaton's delusions.

Dr. Sarrazin speculated that Mr. Seaton's delusions might not be as severe as "some other individuals" because he had not "come to the attention of authorities." R., vol. III, at 79. But Dr. Sarrazin did not identify "other individuals" in his comparison or suggest how Mr. Seaton's delusions could have attracted the attention of the "authorities." The authorities presumably wouldn't have responded based on dangerousness because the parties agree that Mr. Seaton does not pose a danger to himself or others.

And Dr. Preston Baecht did not question the severity of Mr. Seaton's delusions. She testified that

- Mr. Seaton had a "major mental illness," characterized by hallucinations, delusional thinking, and thought disorganization, and

- his "delusions [were] very entrenched, and his thinking [was] very disorganized."

10

R., vol. III, at 18, 33. Nor did Dr. Preston Baecht suggest that she was basing her opinion on a belief that Mr. Seaton's mental condition was commonplace. To the contrary, she based her opinion on statistics regarding competency restoration and her own experience in restoring other defendants to competency.

Faced with a battle of the experts, the district court had to determine whether the government's evidence "instantly tilted the evidentiary scales" when weighed against Mr. Seaton's contrary evidence. *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1228 (10th Cir. 2007) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). And in determining whether the evidentiary scales instantly tilted, the district court needed to focus on the defendant's particular circumstances rather than generalized evidence about the effectiveness of involuntary medication. *See* p. 4, above. This focus required more than unexplained deference to the government's two expert witnesses. Indeed, it was "especially important" for the court to "consider and contend with substantial evidence that would undermine the case for forcible medication." *United States v. Watson*, 793 F.3d 416, 424 (4th Cir. 2015).

In this case, the district court relied solely on a "vote of two to one," referring to the presence of two expert witnesses for the government and only one for Mr. Seaton. Appellant's Opening Br., attach. A, at 6. The existence of one additional expert witness for the government does not

11

supply clear and convincing evidence that involuntary medication is substantially likely to restore Mr. Seaton to competency.

And even if we were to engage in post-hoc consideration of alternative justifications for the *Sell* order, the government's two expert witnesses relied solely on generalized evidence involving the statistical effectiveness of involuntary medication. They didn't even suggest that they were basing their opinions on Mr. Seaton's particular circumstances. Such generalized statistical evidence does not substitute for meaningful consideration of Mr. Seaton's particular circumstances. *See United States v. Evans*, 404 F.3d 227, 241 (4th Cir. 2005).[3] Indeed, "[p]ermitting the government to meet its burden through generalized evidence" involving the statistical effectiveness of involuntary medication on defendants with psychoses "would effectively allow [the government] to prevail in every

---

[3] The *Evans* court explained:

> Instead of analyzing Evans as an individual, the report simply sets up syllogisms to explain its conclusions: (1) atypical antipsychotic medications are generally effective, produce few side effects, and are medically appropriate, (2) Evans will be given atypical antipsychotic medications, (3) therefore, atypical antipsychotic medication will be effective, produce few side effects, and be medically appropriate for Evans. To hold that this type of analysis satisfies *Sell*'s second and fourth factors would be to find the government necessarily meets its burden in every case it wishes to use atypical antipsychotic medication. We do not believe that *Sell*'s analysis permits such deference.

404 F.3d at 241.

case" involving defendants experiencing psychoses. *United States v. Watson*, 793 F.3d 416, 425 (4th Cir. 2015).

* * *

For these reasons, I would vacate the district court's *Sell* order and remand the case with instructions to deny the government's motion for involuntary medication.